Lillian YARBROUGH *v.* David WITTY, Boone County
Clerk, and Bob Hankins, Herbert Kolb, and Don Bishop,
Boone County Election Commissioners

98-552                                          987 S.W.2d 257

Supreme Court of Arkansas
Opinion delivered March 4, 1999

[Petition for rehearing denied April 15, 1999.]

*Oscar Stilley*, for appellant.

*Duncan & Rainwater, P.A.*, by: *Michael R. Rainwater*, for appellee David Witty.

*Gordon Webb*, for appellee Boone County Election Commission.

TOM GLAZE, Justice. This litigation was filed after the Boone County Quorum Court passed Ordinance 97-23, which authorized the issuance of hospital revenue construction bonds for the North Arkansas Regional Medical Center project. Appellant Lillian Yarbrough and other electors circulated a referendum petition to place the bond issue on a special-election ballot. On November 12, 1997, they filed a timely petition containing 433 names with appellee David Witty, the Boone County Clerk. By letter dated November 20, 1997, to Yarbrough, Witty found that only 410 of the names submitted were registered voters; he concluded, without explanation, that the electors' petition was insufficient to call an election.

On December 3, 1997, Yarbrough filed this lawsuit in chancery court for declaratory and injunctive relief, requesting Witty and the Boone County Board of Election Commissioners to call an election so that the Boone County voters could vote on the bond ordinance. Witty answered Yarbrough's allegations, and in doing so, he attached a second letter, dated December 16, 1997, to Yarbrough, wherein Witty explained that he had asked the Attorney General for an opinion concerning how many signatures Yarbrough and her supporters needed in order to make their referendum petition sufficient. The Attorney General's opinion pointed out that Amendment 7 to the Arkansas Constitution and Ark. Code Ann. § 14-14-914 (Repl. 1998) required the calculation of the number of signatures to be based on the total votes cast in the last general election for circuit clerk, but because no votes had been tabulated for that office at the 1996 General Election, petitioners could not strictly comply with that requirement. Relying in part on the case of *Czech v. Munson*, 280 Ark. 219, 656 S.W.2d 696 (1983), the Attorney General concluded that, since it was impossible to use the 1996 General Election vote count for circuit clerk to determine the number of signatures needed for a

referendum, the last Governor's race would be reasonable to use in calculating the referendum signature count. The last vote count in the Governor's race was in 1994 which totaled 10,341, making the required number of signatures to be 1,551. Based on the Attorney General's opinion, Witty offered Yarbrough an additional ten-day period to obtain the number of signatures utilizing the Governor's vote count as the measuring race. Yarbrough declined Witty's offer.

At the chancery court's hearing on this matter, Yarbrough argued that the 410 signatures she and her group had obtained was more than sufficient, because under the plain language of Amendment 7, the number of signatures required should be computed upon the total votes cast at the last preceding general election for the office of circuit clerk. In other words, because no votes were actually tabulated in the 1996 General Election circuit clerk race, petitioners asserted that they did not have to collect any signatures to compel a referendum election; thus, the 410 signatures were more than sufficient for such purpose. Alternatively, she submitted that, if any election other than the 1996 General Election was to be used to determine the number of signatures, then votes cast in the 1996 Primary Election for circuit clerk should be used. If the votes in that primary race had been used, Yarbrough's group would have needed only 305 signatures.

The chancellor essentially rejected all of the parties' arguments and refused to establish either a measuring race or a specific number of signatures required for a referendum. Instead, the chancellor in his judgment held as follows:

> [That Witty's initial] November 20, 1997 letter declaring an insufficiency of numbers — though lacking in specificity — did nonetheless create a statutory opportunity for the plaintiff to submit more signatures or offer proof of those rejected in light of the then insufficiency, and that her failure or refusal to take advantage of that statutory window deprives her of the right to prevail on this issue.

Yarbrough brings this appeal from the chancellor's decision.

As she contended below, Yarbrough argues that Amendment No. 7 and its enabling statute, § 14-14-914, require a signature

count for a county referendum election to be calculated only upon the total votes cast for the office of circuit clerk at the last preceding general election. Amendment 7 and § 14-14-914(c) respectively provide, in relevant part, as follows:

*Amendment 7*

General laws shall be enacted providing for the exercise of the initiative and referendum as to counties. Fifteen per cent of the legal voters of any municipality or county may order the referendum, or invoke the initiative upon any local measures. In municipalities, the number of signatures required upon any petition shall be computed upon the total vote cast for the office of mayor at the last preceding general election; in counties, upon the office of the Circuit Clerk.

*Section 14-14-914(c)*

Petition by Electors. The qualified electors of each county may initiate and amend ordinances and require submission of existing ordinances to a vote of the people by petition if signed by not less than fifteen percent (15%) of the qualified electors voting in the last general election for the office of circuit clerk, or the office of Governor where the electors have abolished the office of circuit clerk.

Yarbrough cites *Bishop v. Linkway Stores, Inc.*, 280 Ark. 106, 655 S.W.2d 426 (1983), for the proposition that, when a constitutional amendment or a statute is plain and unambiguous, there is no room left for judicial construction, and neither the exigencies of a case nor a resort to extrinsic facts will be permitted to alter the meaning of the language used in the statute. Simply stated, she submits that, while the constitution and statutes require the signature vote count for county referendums to be calculated based on 15% of the total votes cast in the 1996 General Election for the office of circuit clerk, that measure or vote count was not abrogated by the election officials' failure to count the votes cast in the circuit clerk's race because the race was unopposed. As already noted, she contends that, since the 1996 circuit clerk's general election race tabulated no votes, the vote count was 15% of zero; thus, no signature (or no more than one signature) was needed to call a referendum election. We cannot agree.

■ ■ We certainly agree with Yarbrough's recitation of the rule that, where the meaning of an act or constitutional amendment is clear and unambiguous, this court is primarily concerned with what the document says, rather than what its drafters may have intended. *Bishop*, 280 Ark. at 109-110, 655 S.W.2d at 428-429. However, we have also said that we will not adopt an interpretation of the law that leads to an absurd result. *Citizens To Establish A Reform Party v. Priest*, 325 Ark. 257, 926 S.W.2d 432 (1996). In *Sturdy v. Hall, Secretary of State*, 201 Ark. 38, 143 S.W.2d 547 (1940), the court dealt with a proposed state-wide initiated measure under Amendment 7. There the court recognized that only eight percent of the voters may propose (initiate) any law and only six percent of the legal voters may petition (order) a referendum on any measure passed by the General Assembly. *Id.* The *Sturdy* court stated that only a small percent of our population may initiate or refer a law to the vote of the people and that, if a power so great may be exercised by a number so small, a substantial compliance with the provisions of the constitution conferring these powers should be required. 201 Ark. at 42, 143 S.W.2d at 550. Obviously, the same rationale holds true for county and municipal initiative and referendum powers.

■ On the other hand, we are met with the settled rule that Amendment 7 necessarily must be construed with some degree of liberality in order that its purposes may be well effectuated. *Leigh and Thomas v. Hall, Secretary of State*, 232 Ark. 558, 339 S.W.2d 104 (1960). In construing Amendment 7, it is our duty to keep constantly in mind the purpose of its adoption and the object it sought to accomplish. *Id.* That object and purpose was to increase the sense of responsibility that the lawmaking powers should feel to the people by establishing a power to initiate proper, and to reject improper, legislation. *Id.*

As our above cases reflect, our court has acknowledged that, because a small percent of the population may by petition exercise great power when initiating or referring a law to the vote of the people, those petitioners must at least substantially comply with the constitutional provisions conferring those powers. By the same token, we must also give the Amendment 7 provisions a lib-

eral construction so the petitioners' acts will not be thwarted by a strict or technical interpretation.

If we were to accept Yarbrough's argument in the circumstances before us, petitioners could initiate or refer laws to the vote of the people without having to obtain any signatures of the electors. That undoubtedly was not contemplated under the Amendment 7 provisions. Nor can we agree with Yarbrough's alternate theory that votes cast for the circuit clerk in the 1996 primary election is proper, since primary elections are not mentioned in Amendment 7.

In *Czech, supra*, petitioners had obtained signatures to refer an ordinance intended to regulate taxicab companies, and petitioners challenged the constitutionality of Ark. Stat. Ann. § 19-717 (Repl. 1980) [now Ark. Code Ann. § 14-47-124 (Repl. 1998)] which provided that the required minimum number of signatures is based on 15% of the highest vote cast at the last preceding general election for any position on the city's board of directors. The city had a city manager form of government, and did not elect a mayor as contemplated under Amendment 7. This court upheld § 19-717's constitutionality, stating that the statute did no violence to the overall intent of Amendment 7. 280 Ark. at 221, 656 S.W.2d at 698. The court's decision was the first to recognize a measuring race different from the one specified in the Amendment.

In the present case, County Clerk Witty, relying on the Attorney General's opinion, decided that the votes cast in the 1994 General Election race for Governor should be the basis for determining the required minimum number of signatures under Amendment 7. As mentioned earlier, that vote count would have required Yarbrough's petition to gather 1,551 signatures. However, a more liberal interpretation of Amendment 7 would allow the petitioners to have used the total votes cast in the last general election for the circuit clerk which was in 1990. That vote count would have required Yarbrough's circulators to obtain only 848 signatures. As can be readily seen, such a minimum number would be a large enough segment of the population to justify the

calling of a referendum, but the number is not so onerous that it would thwart the petitioners' acts under the Amendment.

■ ■ Of course, Yarbrough's petition and 410 signatures fall far short of the signatures as computed under the Governor's race in the 1994 General Election or the circuit clerk's race in 1990. To qualify as an initiative or referendum petition under Amendment 7, the petition must, prima facie, contain at the time of filing the required number of signatures. *Walker v. McCuen*, 318 Ark. 508, 886 S.W.2d 577 (1994). Using either the governor's or circuit clerk's votes noted above, Yarbrough, under the rule in *Walker*, would be precluded from submitting further signatures in an attempt to make their petition sufficient.

Appellees Witty and the Boone County Board of Election Commissioners strenuously argue that Yarbrough adopted an all or nothing strategy when she steadfastly contended that only the 1996 General Election votes cast for circuit clerk could be used to compute the minimum number of signatures required under Amendment 7. In doing so, Yarbrough never asked the chancellor to declare what the threshold number of signatures should be under Amendment 7, but instead proceeded on her theory that, in the circumstances, no signatures (or only one signature) was needed. Accordingly, not too different from the chancellor's holding, appellees assert that Yarbrough effectively waived other theories because she never pursued them. The record tends to support appellees' argument.

Unquestionably, Yarbrough firmly believes in her "zero-vote theory," and adds that, if our court upholds the chancellor's decision, the practical effect will be to allow a county clerk, like Witty, by disobedience of the law, to "raise the bar" and create uncertainty for all persons who might wish to use the initiative or referendum process. It is difficult to understand this part of Yarbrough's argument, especially when Witty had nothing to do with the 1996 General Election election officials' failure to place the circuit clerk's unopposed race on the ballot so that votes cast for that office could be counted for Amendment 7 purposes. Nor would Witty have had control over the election judges and clerks whose responsibility it was to count such votes if the unopposed

circuit clerk's office had appropriately appeared on the 1996 ballot. Witty's only mistake, if any, was his failure to give any reason [as provided under § 14-14-915(e)] for finding Yarbrough's petition insufficient. However, based on the record and argument before us, the only insufficiency attributed to the Yarbrough group's petition had to do with not mentioning the number of signatures needed for the referendum — which is a number Yarbrough, herself, choose not to inquire about.

In short, we fail to see how Witty or any county clerk would be in a position to manipulate events to raise the Amendment 7 minimum-signature requirement. For a county clerk to achieve "raising the bar" (signature count), officials such as county boards of election commissioners and precinct election officials would need to cooperate either to omit the circuit clerk's office on the general election ballot or to refuse to count the circuit clerk's office. Only in these and similar circumstances would the county clerk be permitted (or forced) to compute the signature number using the last general election vote count tabulated for that office. Yarbrough does not allege or contend such events occurred here. We also note that, if election officials erred by somehow failing to put the correct Amendment 7 "measuring race" on the general election ballot, the result likely would end with a smaller signature requirement since the number of registered voters have increased over the past years.[1] While Yarbrough further suggests the circuit clerk vote count would vary depending upon whether or not that office is contested, Yarbrough also does not contend that Witty had or would inject himself into a circuit clerk's race in order to affect the initiative or referendum process.

■ ■ In conclusion, based on the reasons above, we affirm the result reached by the chancellor in denying Yarbrough's complaint. The chancellor correctly rejected Yarbrough's "zero-count theory." In addition, the 410 signatures she and her supporters filed in this referendum matter failed badly to meet the minimum-signature numbers that would result when using either

---

[1] The Secretary of State records reflect that in Boone County, the number of registered voters increased from 16,027 in 1990 to 19,646 in 1996. *See Campbell v. State*, 300 Ark. 570, 781 S.W.2d 14 (1989).

the 1994 Governor's or the 1990 circuit clerk's race. The relief sought by Yarbrough must also be denied since she never asked the chancellor to declare a minimum–signature number, but instead relied on her belief that no signatures were required in the circumstances. For these reasons, we affirm.

ARNOLD, C.J., and SMITH, J., dissent.

W. H. "DUB" ARNOLD, Chief Justice, dissenting. I disagree with the majority opinion. The provision under Arkansas Code Annotated § 14-14-914 (Repl. 1998), authorized by Amendment 7 to the Arkansas Constitution, which addresses the number of signatures required on referendum petitions, is unambiguous; we are, therefore, required to follow it. This Court has recognized the rule of statutory or constitutional construction. In the case of *Bishop v. Linkway Stores, Inc.*, 280 Ark. 106, 644 AS.W.2d 426 (1983), this Court stated:

> It is well-settled that when a constitutional amendment or a statute is plain an unambiguous, there is no room left for judicial construction, and neither the exigencies of a case, nor a resort to extrinsic facts will be permitted to alter the meaning of the language used in the statute.

*Id.* at 109. The majority acknowledged the *Bishop* case as the rule where the meaning of an act or constitutional amendment is clear and unambiguous.

From the facts in this case, we know that a circuit clerk, David Witty, was elected in the 1996 Primary Election. We also know that a general election followed the 1996 Primary Election and that David Witty was unopposed in his race for Boone County Clerk. The ballots, however, were not counted in the 1996 General Election for the office of circuit clerk. The majority would lead you to believe that a general election did not occur because the ballots were not counted. This is, however, a false premise, as general elections always follow primary elections, even when candidates are unopposed. This is how we elect our county officials in Arkansas.

What occurred in this case is very simple; the election officials did not do their job. They failed to place the circuit clerk's

unopposed race on the ballot so that votes cast for that office could be counted for Amendment 7 purposes. Arkansas Code Annotated § 7-5-315 (Repl. 1997) states in pertinent part as follows:

> In counting ballots at the polling site, the following procedures *shall* be followed:

> (1) The votes received by an unopposed candidate in any election held in this state shall not be counted or tabulated by the election officials. The word "UNOPPOSED" shall be sufficient to insert on the tally sheet to indicate that the candidate has received a majority of the votes cast in the election. *However, the votes received by an unopposed candidate for the office of major or circuit clerk shall be counted and tabulated by the election officials*[.] (Emphasis added.)

Abraham Lincoln reminds us that the government is "of the people, by the people, for the people. . . ." A. Lincoln, *Selected Speeches and Writings* 405 (Vintage Books/Library of America, 1992). In the case before us, over 400 voters filed their petition for a referendum of the county ordinance; however, they are denied this right because of the elections officials's failure to do their job.

The majority would suggest that we excuse this failure and look to other general elections for a tabulation in a circuit clerk's race. Tabulations in other general elections would not be the same as the tabulation for the last general election; to look to other general elections would suggest that we are changing the rules or the law to assist the government in its failures. This is not democracy in action. If we do this, Lincoln's statement should be changed to a government of the people, by the people, and for the *government*. I don't think so. We cannot deny the people their right. This matter should be reversed and remanded to allow the referendum.

SMITH, J., joins this dissent.