CAVE CITY NURSING HOME, INC. *v.*
ARKANSAS DEPARTMENT OF HUMAN SERVICES

01-826                                                    89 S.W.3d 884

Supreme Court of Arkansas
Opinion delivered November 21, 2002
[Petition for rehearing denied January 16, 2003.*]

---

* THORNTON, J., would grant. (See supplemental dissenting opinion.)

14

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Debby Thetford Nye* and *Elizabeth Andreoli*, for appellant.

*David S. Long*, for appellee.

D ONALD L. CORBIN, Justice. This is an appeal from an agency decision ordering Appellant Cave City Nursing Home to repay monies it received under the Wage Enhancement Program ("WEP") administered by Appellee Arkansas Department of Human Services. For reversal, Appellant argues that Appellee violated the provisions of the Arkansas Administrative Procedures Act ("APA"), codified at Ark. Code Ann. §§ 25-15-201 to -214 (Supp. 1999), in that its decision exceeded the scope of its statutory authority, was arbitrary and capricious, and not supported by substantial evidence. This case was certified to us as one involving an issue of first impression and statutory interpretation; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1) and (6). We find no error and affirm.

This case centers on a dispute over the correct interpretation of the legislation creating the WEP. In 1999, the Arkansas General Assembly passed Act 1537, which was the appropriations bill for DHS. This act also serves as the enabling legislation for the WEP. Section 127 of Act 1537 contains special language providing in part:

a) Due to the need for enhanced staffing, improved recruitment and retention, and improved quality of direct care personnel, the Department of Human Services (DHS)—Division of Medical Services (DMS) shall implement a facility specific wage enhancement program for nursing facilities effective July 1, 1999. The wage enhancement program's top priority shall be to increase the number of direct care staff, specifically Certified Nurse Assistants (CNAs), serving nursing facility residents, and shall be utilized to meet the minimum staffing requirements which are in effect by rule and are recorded in the Medicaid Long Term Care Provider Manual for the last day of each previous quarter.

The purpose of this legislation was to increase the number of direct care staff in the state's nursing homes by providing the facilities with extra funding for the recruitment and retention of direct care staff. It is undisputed that "direct care staff" encompasses certified nursing assistants ("CNAs"), as they are the employees primarily responsible for the direct care of nursing home patients. The legislation also provided, however, that nursing facilities would be subject to a forfeiture of WEP funds paid to them if they failed to meet the minimum staffing requirements as set forth in the Long Term Care Manual ("Manual"). The issue of what those "minimum staffing requirements" are and to whom they apply led to the dispute in the present case.

During the first quarter of the fiscal year, beginning July 1, 1999, Appellant experienced twelve occurrences of staffing shortages with regards to their registered nursing staff. The parties stipulated that there were no staffing shortages with regard to CNAs or LPNs. Due to the RN shortage, however, Appellee notified Appellant that they were seeking recoupment of $28,269 paid under the WEP for the quarter July 1—September 30, 1999. Appellant appealed the decision, averring that the minimum staffing requirements required under the WEP referred only to the requirements for the staffing of CNAs, and not licensed personnel, such as RNs.

After DHS appointed a hearing officer to adjudicate the matter, a hearing was held on May 3, 2000. By agreement of both parties, testimony taken from a hearing held on April 28, 2000,

was incorporated into the record and included in the transcript of the present matter. This included the testimony of Randy Helms, Chief Program Administrator with DMS. He testified that he serves as the administrator of the WEP. He explained that the requirements for the WEP are contained in the Manual. According to Helms, the failure of an institution to have the required staff for any month in the quarter resulted in a request from DHS that the facility repay the wage enhancement for the entire reporting quarter.

Also testifying at the April 28 hearing was Jim Cooper, President of the Arkansas Health Care Association ("AHCA"). He testified that as President of the AHCA he participated in the development of the WEP during the legislative session. According to Cooper, Act 1537 was tied to Act 1529, which provided for new minimum staffing requirements for nursing facilities.[1] He conceded that Act 1529 addressed not only staffing requirements for CNAs, but also for RNs and LPNs. He maintained, however, that the WEP did not provide funding for all categories of staff identified in Act 1529. According to Cooper, the WEP was to apply specifically to CNAs, because there was not enough money to implement raises for other categories. Cooper further testified on cross-examination that a compromise was achieved during the legislative process that would allow DHS to recoup funds for an entire quarter.

Present and testifying at the May 3 hearing was Annetta Maupin, Administrator for Cave City Nursing Home. She explained that the RN shortages occurred as a result of their Director of Nurses suddenly quitting. She testified that her staff assumed that CNAs were the basis for the WEP, and if they had known that the RN shortage could cause them to forfeit the monies paid under the WEP, they would have paid a staffing agency to fill the position. According to Maupin, she was unaware that RNs and LPNs were going to be calculated for purposes of the WEP.

---

[1] Act 1529 did not take effect until July 1, 2000.

After taking the matter under advisement, the hearing officer determined that DHS followed the procedures of the APA in implementing the WEP. The hearing officer stated that it was clear from the language of section 127 that the top priority of the WEP was to provide additional funds for direct care staff. The hearing officer disagreed, however, with Appellant's assertion that the language "specifically CNAs" meant only that CNAs were to be considered, stating:

> If there is a "top priority", there are also other priorities. Had the Legislature intended that only CNAs be the subject of the WEP, the language would have reflected that the "only priority" was CNAs, or that the program was to apply only to CNAs. It did not. The word "specifically" was used, not the words "solely" or "exclusively".

The hearing officer further noted that Act 1537 could not be considered in isolation, but rather had to be considered in light of Act 1529, which set out to improve the staffing ratios of both licensed and unlicenced personnel. The hearing officer also pointed out that because the purpose of Act 1537 was to improve and increase direct patient care in nursing facilities, it was not unreasonable to require those facilities to meet certain minimum staffing requirements. The hearing officer ultimately concluded, however, that the regulations enacted by DHS-DMS exceeded the scope of legislative authority by imposing penalties for a nursing facility's failure to meet the requirements for licensed nursing personnel, when Act 1537 envisioned application to direct care staff.

DHS reviewed the hearing officer's recommendation and accepted it with modifications. It determined that the hearing officer's conclusion that the adoption and application of minimum staffing standards with respect to licensed personnel was outside the scope of Act 1537 was directly in conflict with the hearing officer's conclusion that the WEP was intended to cover all direct care staff as set out in the Manual, including RNs. Thus, DHS's final order found that Appellant had failed to meet the minimum staffing requirements in place because of the RN shortage, and was thereby required to repay $28,269 in wage enhancement monies paid for the July 1—September 30, 1999, quarter.

Appellant then appealed this final agency decision to the Pulaski County Circuit Court. A hearing was held on March 6, 2001, and each side argued the merits of their position. No further testimony was taken. An order entered on March 28, 2001, affirmed the DHS's decision that Appellant was required to repay the wage enhancement money. This order incorporated by reference a March 13, 2001, letter order from the court. Therein, the circuit court held that Act 1537 consistently tied the wage enhancement payments to the condition that the facilities meet the minimum staffing requirements, not the minimum requirements for CNAs. The circuit court further ruled that the act was quite clear that forfeiture of the wage enhancement was to be on a quarterly basis. This appeal followed.

▆▆▆▆ It is well settled that this court's review is limited in scope and is directed not to the decision of the circuit court but to the decision of the administrative agency. *Arkansas Prof'l Bail Bondsman Lic. Bd. v. Oudin*, 348 Ark. 48, 69 S.W.3d 855 (2002); *Arkansas Contractors Lic. Bd. v. Pegasus Renovation Co.*, 347 Ark. 320, 64 S.W.3d 241 (2001); *Tomerlin v. Nickolich*, 342 Ark. 325, 27 S.W.3d 746 (2000). As with all appeals from administrative decisions under the APA, the circuit court or appellate court may reverse the agency decision if it concludes:

> [T]he substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>> (1) In violation of constitutional or statutory provisions;
>> (2) In excess of the agency's statutory authority;
>> (3) Made upon unlawful procedure;
>> (4) Affected by other error or law;
>> (5) Not supported by substantial evidence of record; or
>> (6) Arbitrary, capricious, or characterized by abuse of
> discretion.

Ark. Code Ann. § 25-15-212(h) (Repl. 2002). *See also Arkansas Dep't of Human Servs. v. Thompson*, 331 Ark. 181, 959 S.W.2d 46 (1998); *Wright v. Arkansas State Plant Bd.*, 311 Ark. 125, 842 S.W.2d 42 (1992). In *Wright*, this court explained:

> We have recognized that administrative agencies are better equipped than courts, by specialization, insight through experi-

ence, and more flexible procedures to determine and analyze underlying legal issues affecting their agencies, and this recognition accounts for the limited scope of judicial review of administrative action and the refusal of the court to substitute its judgment and discretion for that of the administrative agency.

*Id.* at 130, 842 S.W.2d at 45; *see also Oudin*, 348 Ark. 48, 69 S.W.3d 855.

Appellant argues that DHS's order should be reversed because it violates the APA. Appellant avers that DHS's interpretation of Act 1537 is clearly wrong, because it ignores the legislative intent of the act when it includes RNs in its enforcement actions and measures compliance on a quarterly basis, rather than a monthly basis. DHS counters that the legislative intent of the act may be ascertained from the plain language of the act itself. According to DHS, the legislative intent of Act 1537 was to provide incentive payments to those nursing facilities that meet the minimum staffing requirements as set out in the Manual. Thus, we are presented with an issue of statutory interpretation.

When reviewing issues of statutory interpretation, we are mindful that the first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Yamaha Motor Corp. v. Richard's Honda Yamaha*, 344 Ark. 44, 38 S.W.3d 356 (2001); *Dunklin v. Ramsay*, 328 Ark. 263, 944 S.W.2d 76 (1997). When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. *Burcham v. City of Van Buren*, 330 Ark. 451, 954 S.W.2d 266 (1997). A statute is ambiguous only where it is open to two or more constructions, or where it is of such obscure or doubtful meaning that reasonable minds might disagree or be uncertain as to its meaning. *ACW, Inc. v. Weiss*, 329 Ark. 302, 947 S.W.2d 770 (1997). When a statute is clear, however, it is given its plain meaning, and this court will not search for legislative intent; rather, that intent must be gathered from the plain meaning of the language used. *Ford v. Keith*, 338 Ark. 487, 996 S.W.2d 20 (1999); *State v. McLeod*, 318 Ark. 781, 888 S.W.2d 639 (1994). This court is very hesitant to interpret a legislative act in a manner con-

trary to its express language, unless it is clear that a drafting error or omission has circumvented legislative intent. *Id.*

We have further held that it is also a rule of statutory construction that the manner in which a law has been interpreted by executive and administrative officers is to be given consideration and will not be disregarded unless it is clearly wrong. *Yamaha Motor Corp.*, 344 Ark. 44, 38 S.W.3d 356; *Omega Tube & Conduit Corp. v. Maples*, 312 Ark. 489, 850 S.W.2d 317 (1993). An administrative interpretation is to be regarded as highly persuasive. *Id.* However, where the statute is not ambiguous, this court will not interpret it to mean anything other than what it says. *Ford*, 338 Ark. 487, 996 S.W.2d 20.

In the present matter, Appellant does not argue that Act 1537 is ambiguous; rather, it argues that DHS incorrectly interprets the language of the act. In its brief to this court, Appellant acknowledges that under Act 1537, nursing homes are required to comply with staffing requirements contained in the DMS memorandum. Appellant further acknowledges that the DMS memorandum contains staffing standards not only for CNAs, but also for RNs and LPNs. Appellant then argues, however, that the plain legislative intent of the act was to enforce those staffing standards only as they apply to CNAs. According to Appellant, the key phrase in Act 1537 is "[t]he wage enhancement program's top priority shall be to increase the number of direct care staff, specifically Certified Nurse Assistants[.] In support of this argument, Appellant points to the word "specifically," which is used to modify the verb "increase." According to Appellant, specifically means "to clearly define." Thus, according to Appellant, the WEP only encompasses certified employees.

Appellant also attempts to support its argument that the central purpose of the WEP was to provide incentive for those facilities meeting staffing requirements for CNAs by relying on testimony from certain individuals who participated in the drafting of Act 1537. We have held, however, that when a statute is plain and unambiguous, extrinsic facts should not be permitted to alter the meaning of the language used in the statute. *See Yamaha Motor Corp.*, 344 Ark. 44, 38 S.W.3d 356; *Yarbrough v.*

*Witty,* 336 Ark. 479, 987 S.W.2d 257 (1999). Simply stated, where the meaning of an act is clear and unambiguous, this court is primarily concerned with what the document says, rather than what its drafters may have intended. *Id.; Atkinson v. Board of Trustees of the Univ. of Ark.,* 262 Ark. 552, 559 S.W.2d 473 (1977). This court has also held that the testimony of the legislators with respect to their intent in introducing legislation is clearly inadmissible. *Board of Trustees v. City of Little Rock,* 295 Ark. 585, 750 S.W.2d 950 (1988). In sum, we have noted that little weight should be attached to expressions of individual members of the legislature or those persons who participated in the drafting of the legislation. *Yamaha Motor Corp.,* 344 Ark. 44, 38 S.W.3d 356. Accordingly, the testimony regarding the intent of those persons who participated in the creation and drafting of the WEP is of no consequence in the present case where the legislation at issue is not ambiguous.

█ █ DHS argues that in order for this court to accept Appellant's interpretation of Act 1537, it would have to ignore the clear language dictating that the WEP's "top" priority was to increase the number of direct care staff. According to DHS, the fact that there is a "top" priority means that there are other priorities as well. We agree. Our review of the language of Act 1537 reveals that the legislature intended to provide incentives to nursing facilities for meeting the minimum staffing requirements. The fact that the act specifically points to CNAs does not mean that the intent of the legislature was to ignore other personnel, particularly licensed personnel. In fact, during oral argument to this court, counsel for DHS stated that there was no regulation that required nursing facilities to use WEP funds for CNAs' salaries only; rather, the only requirement was that the monies be used for labor costs. Thus, if the legislature had intended to tie the WEP only to requirements for CNAs, it could have done so. Without evidence of a drafting omission, this court will not read into legislation what is not there. *See McLeod,* 318 Ark. 781, 888 S.W.2d 639. As previously pointed out, the interpretation placed on a statute or regulation by an agency or department charged with its administration is entitled to great deference and should not be overturned unless clearly wrong. *Little Rock Cleaning Sys., Inc. v.*

*Weiss*, 326 Ark. 1007, 935 S.W.2d 268 (1996); *Douglass v. Dynamic Enters., Inc.*, 315 Ark. 575, 869 S.W.2d 14 (1994). Accordingly, we cannot say that DHS's interpretation of Act 1537 was clearly wrong.

Finally, Appellant argues that DHS's application of monthly staffing standards, as opposed to quarterly staffing standards, is contrary to the plain language of Act 1537. Specifically, Appellant argues that the WEP does not give DHS the authority to recoup the wage enhancement payments for an entire quarter based on noncompliance standards set for any one month. According to Appellant, Act 1537 dictates that staffing requirements must be determined on a quarterly basis.

DHS counters that Appellant incorrectly interprets the language of section 127. It argues that the act requires it to determine quarterly the extent to which each nursing facility meets the staffing requirements established by the rules promulgated by the DHS-DSM. A review of Long Term Care Memorandum LTC-M-99-14, by which DHS promulgated the WEP, reveals that nursing facilities were notified that failure to meet the minimum staffing requirements in a reporting quarter would result in recoupment of the wage enhancement payments made for the entire quarter. The memorandum further sets forth those minimum requirements on a monthly basis. Nothing in the language of Act 1537 nor in the long term care memorandum requires DHS to base its staffing requirements on a quarterly, rather than monthly, basis. The only dictate found in the act is that DHS review compliance on a quarterly basis. Again, this court will not read into legislation language that is not there. *See Ford*, 338 Ark. 487, 996 S.W.2d 20. Accordingly, we cannot say that DHS's interpretation of Act 1537 was clearly erroneous.

Affirmed.

THORNTON, J., dissents.

ARNOLD, C.J., not participating.

Ray Thornton, Justice, dissenting. On the issue of whether the staffing requirements apply to the director of nursing performing supervisory functions, and not providing direct care to patients, I respectfully dissent. The majority correctly states that the purpose of the legislation and the extra funding was to increase the number of direct care staff in the state's nursing home facilities. In keeping with this purpose, the manual sets out the staffing requirements related to increasing direct care, and specifically provides that "RN's can also be used to perform LPN duties with the same reporting requirements." It was not necessary for this director of nursing to be on duty for direct care during her absences because there was a determination that the staffing requirements for CNA and LPN direct care assignments were completely filled throughout the quarter. I think that the emphasis upon meeting direct care requirements in accordance with the special language of the legislative funding for such efforts is further buttressed by the manual language setting out the staffing requirements for direct care:

> Only those hours spent performing *direct care employee* class (CNA, RN, LPN, Director of Nursing) related *duties* will be allowable in the determination of meeting the minimum staffing requirements.

(Emphasis added.) The rule clearly states that the hours spent performing direct care related duties were the hours intended to be included in the calculation of the fulfillment of the staffing requirement. There was no showing that the director of nursing was required to provide direct care during the quarter when the absences occurred because all direct care responsibilities were fully met by CNAs and LPNs.

In its holding, the majority fails to consider that the purpose of the Act was to increase direct care and, in my opinion, mistakenly interprets the language of the rule establishing staffing requirements only for direct care. This holding results in substantial unfairness to this facility and its patients, and therefore, I respectfully dissent.

## SUPPLEMENTAL DISSENTING OPINION ON DENIAL OF PETITION FOR REHEARING

No. 01-826                                    94 S.W.3d 923

Supreme Court of Arkansas
Delivered January 16, 2003

RAY THORNTON, Justice, dissenting. I would grant the petition for rehearing. I agree with appellant that the majority opinion did not require DHS to follow the clear language of the Act when it determined that the agency could measure compliance with the staffing requirement monthly rather than quarterly.

The Appropriation Act states:

> The wage enhancement program's top priority shall be to increase the number of direct care staff, specially Certified Nurse Assistants (CNAs), serving nursing facility residents, and shall be utilized to meet the minimum staffing requirements which are in effect by rule and are recorded in the Medicaid Long Term Care Provider Manual for the last day of each previous quarter.

Appropriation Act 1537, Section 127(a).

Appellant contends that the correct interpretation of this passage results in the requirement that nursing facilities meet staffing requirements for the CNAs. Appellant further asserts that, contrary to the clear language of the Act, the majority opinion requires it to reimburse DHS for all wage enhancements received during a quarter when a temporary vacancy occurred in one RN position, even though quarterly staffing requirements for all staff were met. Appellant points out that it is required to return payments made to provide enhancements in CNA direct care staff on the basis of a temporary RN staff shortage that was not reflected in a computation based upon quarterly reporting.

The majority opinion stated that nothing in the Act required that DHS base its staffing requirements on a quarterly basis, rather

than a monthly basis. However, appellant points out the provision found in the Act requiring that the staffing standard was to be that which was "recorded in the Medicaid Long Term Care Provider Manual for the last day of each previous quarter." Section 127(a). Appellant also points out that the word "monthly" does not appear anywhere in the statute, and that the criteria "quarterly" appears throughout the Act. The Act provides:

> Beginning with the first completed quarter of SFY 1999-2000, the DHS-DMS shall provide the per patient day wage enhancement to each Medicaid certified nursing facility. The DHS-DMS shall determine *on a quarterly basis* the extent to which each nursing facility meets the staffing requirements established by enactments fo the 82nd General Assembly or by rules promulgated by the DHS-DMS to enhance staffing rates. The DHS-DMS shall recoup the entire wage enhancement payments made to a nursing facility *for a particular quarter* during which the nursing facility failed to meet the minimum staffing requirements."

Appropriation Act 1537, section 127(a) (Emphasis added). This provision clearly directs that the quarter, not the month, was to be the time period by which the staffing standard was measured.

Appellant asserts that "[t]here is nothing in the Appropriation Act that allows DHS to determine compliance based on monthly standards." Cave City Nursing Home suffered an unexpected staff shortage for eight days during a one-month period but recovered and made up for the loss during the next two months that made up the quarter. The statute provides that the staffing numbers are based upon the quarter, not the month. That statutory requirement cannot be overturned by an administrative rule providing for monthly reports. The statutory provision should control.

Appellant asserts, and I agree, that the majority's holding results in substantial unfairness. Therefore, I would grant the petition for rehearing.