SHIPLEY, INC., d/b/a That Bookstore in Blytheville;
Arkansas Library Association; American Booksellers Foundation
for Free Expression, Inc.; Association of American Publishers, Inc.;
Comic Book Legal Defense Fund; Freedom to Read Foundation;
International Periodical Distributors Association, Inc.;
American Civil Liberties Union of Arkansas, Inc., *v.*
Fletcher LONG, Jr., District One Prosecuting Attorney, et al.
(Namely All the Other Prosecuting Attorneys in the State of Arkansas)

04-136                                          195 S.W.3d 911

Supreme Court of Arkansas
Opinion delivered October 21, 2004

*Sonnenschein Nath & Rosenthal LLP*, by: *Michael A. Bamberger*; and *Lavey & Burnett*, by: *John L. Burnett*, for petitioners.

*Mike Beebe*, Att'y Gen., by: *Timothy G. Gauger*, Sr. Ass't Att'y Gen. and *Jill Jones Moore*, Ass't Att'y Gen., for respondents.

Tom Glaze, Justice. This case is before us on certification from the United States District Court for the Eastern District of Arkansas, pursuant to Ark. Sup. Ct. R. 6-8 (2004). The federal court has certified four questions to us, asking us to provide an interpretation of Act 858 of 2003, as codified at Ark. Code Ann. § 5-68-501 *et seq.* (Supp. 2003). *See Shipley, Inc. v. Long*, 356 Ark. 220, 148 S.W.3d 746 (2004).

In 1969, the General Assembly enacted Act 133, which made it unlawful for any person to knowingly sell to a minor certain materials considered "harmful to minors." *See* Ark. Code Ann. § 5-68-502(a) (Repl. 1997). The definition of "harmful to minors" at that time comported with the United States Supreme Court's decision in *Ginsberg v. New York*, 390 U.S. 629 (1968). In 1993, the General Assembly passed Act 1263, which amended Act 133 of 1969 by changing the definition of "harmful to minors" to reflect the definition of obscenity the Supreme Court adopted in *Miller v. California*, 413 U.S. 15 (1973). The new definition — which is still in use in the current version of the statute — provides as follows:

> "Harmful to minors" means *that quality of any description, exhibition, presentation, or representation, in whatever form*, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when the material or performance, taken as a whole, has the following characteristics:

(A) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest in sex to minors;

(B) The average person eighteen (18) years of age or older applying contemporary community standards would find that the material or performance depicts or describes nudity, sexual conduct, sexual excitement, or sadomasochistic abuse in a manner that is patently offensive to prevailing standards in the adult community with respect to what is suitable for minors; and

(C) The material or performance lacks serious literary, scientific, medical, artistic, or political value for minors[.]

§ 5-68-501(2)(A) (Supp. 1999 & 2003) (emphasis added).

The 1999 version of the statute prohibited the "display [of] material which is harmful to minors in such a way that minors, as a part of the invited general public, will be exposed to view such material." § 5-68-502(1)(A) (Repl. 1999). However, the statute also contained a "safe harbor" provision that provided a person "shall be deemed not to have displayed material harmful to minors if the material is kept behind devices commonly known as 'blinder racks' so that the lower two-thirds (2/3) of the material is not exposed to view[.]" § 5-68-502(1)(B) (Supp. 1999).

In 2003, the General Assembly amended §§ 5-68-501–502 even further by enacting Act 858, which requires material deemed "harmful to minors" to be obstructed from view and physically segregated. In relevant part, the 2003 version of the statute provides as follows:

It shall be unlawful for any person, including, but not limited to, any persons having custody, control, or supervision of any commercial establishment, to knowingly:

(1)(A) Display material which is harmful to minors in such a way that minors, as a part of the invited general public, will be exposed to view such material.

(B) Provided, however, a person shall be deemed not to have displayed material harmful to minors if the lower two-thirds (2/3) of the material is not exposed to view and segregated in a manner that physically prohibits access to the material by minors; or

(2)(A) Sell, furnish, present, distribute, allow to view, or otherwise disseminate to a minor, with or without consideration, any material which is harmful to minors.

On June 10, 2003, a group of bookstore owners, booksellers' associations, librarians, publishers[1] (collectively hereinafter "the booksellers") filed a complaint in the United States District Court, Eastern District of Arkansas. The named defendants were each of the State's prosecuting attorneys ("the State"). The complaint sought to enjoin the enforcement of, and to declare facially unconstitutional and void, the newly amended portions of § 5-68-502. Among other things, the booksellers alleged that the "offending sections" would impose severe restrictions on the availability, display, and distribution of material that was not obscene as to adults; in particular, they contended that it would not be possible under § 5-68-502, as amended, to restrict the display of materials deemed "harmful to minors" without also restricting access by adults.

After the State answered, generally denying the allegations of the complaint, both the booksellers and the State filed cross-motions for summary judgment. After a hearing on the motions, the federal district court issued a "Certification Order," dated February 4, 2004. In the order, the federal court expressed a number of concerns about the constitutional issues raised by a variable obscenity statute, such as Arkansas', in the context of access and display regulation.[2] In particular, the district court questioned whether a narrowing interpretation might be able to save the statute, or whether such an interpretation would "distort the obvious objectives of the statute." As such, the federal district court certified four questions to this court. Those questions are as follows:

I. Is the statute (§ 5-68-501, *et seq.*) intended to protect *all* minors, i.e., all persons seventeen years of age and younger, from expo-

---

[1] The named plaintiffs are Shipley, Inc., d/b/a That Bookstore in Blytheville; the Arkansas Library Association; American Booksellers Foundation for Free Expression, Inc.; Association of American Publishers, Inc.; Comic Book Legal Defense Fund; Freedom to Read Foundation, Inc.; International Periodical Distributors Association; and the American Civil Liberties Union of Arkansas, Inc.

[2] We point out that the instant case involves a challenge only to the display provisions of Act 858, now codified at Ark. Code Ann. § 5-68-502(a)(A) & (B) (Supp. 2003); the prohibition on selling harmful materials to minors, *see* Ark. Code Ann. § 5-68-502(2)(A) (Supp. 2003), is not at issue.

sure to "materials harmful to minors?" If the answer is "yes," may the statute nevertheless be interpreted under Arkansas law to protect only those who are the older, more mature minors from exposure to such materials, if that interpretation is the only way to protect the statute from a successful attack under the United States Constitution?

II. The statute (§ 5-68-502) makes it unlawful to "display material which is harmful to minors in such a way that minors, as part of the invited general public, will be exposed to view such material." Are books and magazines that have contents containing materials harmful to minors but which have no such materials on their binders or covers being "displayed" under the statute if they are simply shelved in bookcases or on book shelves without any additional action or effort to single them out or to draw the attention of the "invited general public" thereto?

III. Does a bookseller or librarian "allow to view . . . to a minor . . . any material which is harmful to minors," § 5-68-502(2)(A), by simply shelving and displaying such material, or must he or she affirmatively give permission (i.e. "allow") the minor to view such materials before he or she breaches the "allow to view" provision?

IV. The "safe harbor" provision contained in § 5-68-502(1)(B) requires that the material be "segregated in a manner that physically prohibits access to the material by minors." What must booksellers and librarians do to avail themselves of this provision?

The first of the federal court's four questions poses the heart of the matter: can § 5-68-502, as amended, be given a narrow enough construction that will both save the statute from constitutional infirmity and, at the same time, leave it with any meaning? Before answering the question, we first address our standards for statutory construction.

■■ Statutes, of course, are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. *Reinert v. State*, 348 Ark. 1, 71 S.W.3d 132 (2002). If it is possible to construe a statute as constitutional, we must do so. *Id.* However, the cardinal rule of statutory construction is to effectuate the legislative will. *Bank of Eureka Springs v. Evans*, 353 Ark. 438, 109 S.W.3d 672 (2003); *Ozark Gas Pipeline v. Arkansas Pub. Serv.*

*Comm'n*, 342 Ark. 591, 29 S.W.3d 730 (2000). Further, we have said that we will not engage in interpretations that defy common sense and produce absurd results. *See Green v. Mills*, 339 Ark. 200, S.W.3d 492 (1999); *Yarbrough v. Witty*, 336 Ark. 479, 987 S.W.2d 257 (1999); *Citizens To Establish A Reform Party v. Priest*, 325 Ark. 257, 926 S.W.2d 432 (1996).

■ The federal district court first asks this court whether the statute is intended to protect *all* minors, or all persons seventeen years of age and younger, from exposure to material deemed "harmful to minors." The answer to this question is plainly yes. Ark. Code Ann. § 5-68-501(7) (Supp. 2003) defines a minor as "*any person* under the age of eighteen (18) years" (emphasis added). There is no limitation or qualification on this definition; thus, we construe the phrase "any person" to mean "every person" under the age of eighteen. Both the booksellers and the State agree on this issue. Because the statute defines a minor as "any person under the age of eighteen," the statute is obviously intended to protect *all* minors from exposure to material deemed "harmful to minors."

The second part of the district court's question asks whether, if the answer to the first part is "yes," may the statute be interpreted under Arkansas law "to protect only those who are the older, more mature minors from exposure to such materials, if that interpretation is the only way to protect the statute from a successful attack under the United States Constitution." This is the approach taken by the supreme court of Virginia in *Commonwealth v. American Booksellers Ass'n, Inc.*, 236 Va. 168, 372 S.E.2d 618 (1988). There, the Virginia court construed a statute that forbade selling or "display[ing] . . . in a manner whereby juveniles may examine and peruse" various materials deemed harmful to juveniles. *See* Va. Code Ann. § 18.2-391 (1985). The Virginia statute was initially found to be unconstitutional in federal court. *See American Booksellers Ass'n, Inc. v. Strobel*, 617 F. Supp. 699 (E.D. Va. 1985), *aff'd, American Booksellers Ass'n, Inc. v. Virginia*, 802 F.2d 691 (4th Cir. 1986). However, on appeal to the United State Supreme Court, the Court noted that the highest court of Virginia had yet to provide an authoritative interpretation of the statute, and so the Court remanded the case to the supreme court of Virginia for its review. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988).

The Virginia Supreme Court first examined the exhibits submitted during the trial of this case in the federal district court.

*Commonwealth v. American Booksellers Ass'n, Inc.*, 236 Va. 168, 372 S.E.2d 618 (1988) (*American Booksellers IV*). First, the Virginia court examined the sixteen books submitted by the plaintiffs, and determined that the issue, as phrased by the United States Supreme Court, was whether any of those books were "harmful to juveniles" within the statutory definition. The Virginia court then noted that a "publication must be judged for obscenity as a whole, . . . and not on the basis of isolated passages." *American Booksellers*, 236 Va. at 175, 372 S.E.2d at 622. The court then cited the three-pronged test for determining when material is "harmful to minors," as set out in *Miller v. California, supra*: 1) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; 2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable public law; and 3) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. *See Miller*, 413 U.S. at 24.

In applying that test, the Virginia supreme court noted that the first two prongs are "purely questions of fact for determination by a properly instructed jury," and thus matters inappropriate for an appellate court. *American Booksellers*, 236 Va. at 176, 372 S.E.3d at 623 (citing *Miller*, 413 U.S. at 30). However, the court then noted that the third prong, "lack of serious merit," was a mixed question of law and fact, which the appellate court might properly decide. *Id.* Because a work could not be deemed "harmful to minors" without meeting all three prongs, the court determined that it would consider and address the third prong alone. *Id.*

The Virginia high court concluded that the focus of the inquiry should not be upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class. The court concluded, "if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole." *Id.*, 372 S.E.2d at 624, 372 S.E.2d at 177.

In the present case, the State urges us to adopt the same "narrowing" interpretation utilized by the Virginia court, reminding this court that it is our duty, if it is at all possible, to adopt an interpretation of an act that preserves its constitutionality. However, under the Virginia court's so-called "variable obscenity" interpretation, works which are plainly inappropriate for

younger children would not fall within the scope of the statute, because those works would have some serious literary, artistic, political, or scientific value for an older adolescent. For example, during oral argument, counsel for the booksellers pointed out that a book such as *The Joy of Sex* could be considered to have serious value for a married seventeen-year-old, who might refer to the book for guidance. That book, counsel surmised, has serious value for the older minor, and therefore it would not be considered "harmful," within the meaning of the statute and would thus be available for all minors to examine. However, *The Joy of Sex* is obviously not suitable for a five-year-old child, who would nonetheless have access to this book under the State's proffered interpretation.[3]

■ As noted above, by its specific language in § 5-68-501(7), the General Assembly clearly intended to protect *all* minors from harmful materials. However, it is also obvious that the State's construction does *not* protect *all* minors, because it permits younger minors to have access to material that may actually be "harmful" to them, within the meaning of the Arkansas statute. Under such an interpretation, the "exception[s] would swallow the rule, and the rule would be meaningless." *Griffen v. Arkansas Judicial Discipline & Disability Comm'n*, 355 Ark. 38, 130 S.W.3d 524 (2003).

■■ The State asserts that the five-year-old would still be protected from material that is considered "harmful" to a seventeen-year-old, and that the statute can be saved by interpreting it in that manner. However, the General Assembly's declared intent was to protect "minors," defined as "any person under the age of eighteen years." If the younger minors are to be protected from "harmful" materials, surely the General Assembly did not intend for those younger children to be permitted to access materials that would arguably be "harmful" to them, even though not "harmful" to an older child. We cannot construe Arkansas' statutory law in such a way as to render it meaningless, and we will not interpret a statute to yield absurd results that are contrary to legislative intent. *City of Maumelle v. Jeffrey Sand Co.*, 353 Ark. 686,

---

[3] Other books would serve equally as well in this hypothetical scenario: for example, works by authors ranging from D.H. Lawrence to Judy Blume contain graphic depictions of sexual conduct. Innumerable works, such as health books and art books, contain depictions of nudity.

120 S.W.3d 55 (2003). Therefore, we must reject the "narrowing interpretation" proposed by the State, and as such, we answer the second part of the federal district court's first question in the negative.

■ The second question the federal court certified to us requires us to interpret the word "display," as set out in § 5-68-502, which, as noted above, provides in relevant part that it shall be unlawful to "display material which is harmful to minors in such a way that minors, as a part of the invited general public, will be exposed to view such material." The federal court asks whether books and magazines with "harmful" contents, but with no "harmful" material on their covers, are "displayed" under the statute if they are simply shelved in bookcases or on bookshelves without any additional action or effort on the part of the bookseller to single them out or draw attention to them. In *Ginsberg v. State of New York*, 390 U.S. 629 (1968), the Supreme Court held that a state may prohibit the distribution of sexually explicit materials to children, even though the materials would not be considered obscene if they were distributed to an adult. *Ginsberg*, 390 U.S. at 636-37. Such prohibitions are permissible, so long as they do not unreasonably restrict adults' access to material which is not obscene as to them. *See Upper Midwest Booksellers v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1986).

■ The Arkansas statute employing the word "display" does not define the term. However, other sources define the word to mean "to present or hold up to view." *See The American Heritage College Dictionary* at 400 (3d ed. 1997). The booksellers argue that the "display" provisions of the Arkansas statute encompass books without "harmful" materials on their covers, suggesting that the deletion of the blinder rack provision,[4] and the addition of the "physical segregation" requirement, means that the display restriction also includes within its scope works without harmful materials depicted on their covers. Specifically, the booksellers claim, the phrase "segregated in a manner that physically prohibits access to the material" indicates that more than visual obstruction is in-

---

[4] A "blinder rack" is a device used to shield from view the lower two-thirds of a work's cover.

tended; otherwise, simply using blinder racks — the option previously provided, but now deleted by the General Assembly — would be sufficient.

The State, on the other hand, asserts that books and magazines without harmful materials on their covers should not be considered "on display" if they are simply shelved in bookcases or on book shelves. The State suggests that the physical segregation requirement is intended to prevent minors from browsing through books or magazines that, by virtue of "harmful" materials on their covers, might tempt minors to browse through or view matters inside the book or magazine.

■ However, the State's argument overlooks the fact that the statute's definition of "material" does not limit that term to the covers of books and magazines. "Material" is defined as "any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture, film, record, recording tape, CD-ROM disk, magnetic disk memory, magnetic tape memory, video tape, or other media, but does not include matters displayed, transmitted, retrieved, or stored on the internet or other network for the electronic dissemination of information[.]" § 5-68-501(6). The question posed to this court was whether "*materials*" that are "harmful to minors" are displayed when they are set out on the bookstore shelf. A literal reading of the statute would have to mean that materials harmful in terms of their content, even if they have no "harmful" material on their covers, *are* "displayed in such a way that minors . . . will be exposed to view such materials," if they are simply shelved, because the terms of the statute make it plain that "material" is *not limited to the covers* of books and magazines.

■ The concurring opinions assert that a book without a harmful cover is not "displayed" to minors if it is merely present on a bookshelf. However, this ignores the fact that the statutory definition of "material" makes no distinction between contents and covers. Clearly, the General Assembly's intent was to include all material harmful to minors, whether that "harmful" material is on a book's cover or is contained within its pages.

■ In sum, if "material harmful to minors" is shelved on a bookshelf, even without some other effort made to draw attention to it, it is "displayed" within the meaning of the statute. Even if a book only has "harmful" content, but not a "harmful" cover,

the bookseller could still be subject to prosecution if that book were not obstructed from view *and* physically segregated. Thus, we answer the second question in the affirmative.

The federal court's third question pertains to § 5-68-502(2)(A), which makes it unlawful for any person to "[s]ell, furnish, present, distribute, allow to view, or otherwise disseminate to a minor, with or without consideration, any material which is harmful to minors." There is no "safe harbor" provision in this subsection, as there is in § 5-68-501(1)(A), other than a provision that the prohibition does not apply to dissemination by a parent, guardian, or relative, or a dissemination with the permission of the parent or guardian. The question is whether a bookseller "allow[s] [a minor] to view . . . any material which is harmful to minors" if the bookseller merely places books on a shelf, or whether there must be some active involvement on the part of the bookseller, such as affirmatively granting permission, before he or she breaches the "allow-to-view" provision. In other words, does "allow" connote active or passive involvement on the part of the book-seller?

As with the other issues, the parties take radically different views of the word "allow," which, like "display," is not defined in the statute. The booksellers argue that it means something passive, citing the definition in *Webster's II New College Dictionary*, which provides that "to allow" means "to let do or happen." Therefore, the booksellers contend, the statute is violated by a mere passive "failure to prevent," and a party could be prosecuted for failing to take active steps to prevent minors from viewing allegedly harmful materials.

The State responds that, given the context of the statute, "allow to view" must connote some active step. The phrase "allow to view" is embedded in a clause that forbids a bookseller to "sell, furnish, present, distribute, . . . or otherwise disseminate to a minor" harmful materials. The other prohibited activities are efforts in which a bookseller must actively engage, argues the State, and therefore, to "allow [a minor] to view" harmful material must involve an affirmative act, or a deliberate decision to "turn a blind eye knowing that a minor is viewing material covered by the statute."

Our answer to this question hinges on the fact that the phrase "allow to view" is combined with the word "knowingly." It is unlawful, under the statute, for a person to *"knowingly*

. . . allow [a minor] to view" "harmful" materials. The *scienter* requirement thus puts an affirmative burden on the bookseller to actively permit a minor to view harmful materials. Under the criminal code, a person "acts knowingly with respect to his [or her] conduct or the attendant circumstances when he [or she] is aware that his [or her] conduct is of that nature or that such circumstances exist." Ark. Code Ann. § 5-2-202(2) (Repl. 1997). Thus, to violate the "allow-to-view" provisions, a bookseller must be aware that certain circumstances exist — i.e., that a minor is viewing "harmful"material. Simply shelving and displaying "harmful" materials is likely not enough for a bookseller to violate the "allow-to-view" provisions, but neither is a bookseller required to grant affirmative permission for a minor to look at "harmful" materials before he or she will be in violation of the statute. The language of the statute indicates that a bookseller must be aware that a minor is viewing "harmful" material, and then deliberately turn a blind eye to that activity, before the bookseller will have allowed a minor to view "harmful" material.

The federal district court's fourth and final question asks us to declare what booksellers and librarians must do in order to avail themselves of the "safe harbor" provision, contained in § 5-68-502(1)(B). That provision reads, "a person shall be deemed not to have displayed material harmful to minors if the lower two-thirds (2/3) of the material is not exposed to view and [is] segregated in a manner that physically prohibits access to the material by minors."[5]

Both the booksellers and the State propose means by which the booksellers might avoid prosecution under the statute. The booksellers suggest that they and librarians must "create a separate room or physically segregated area, with one or more entryways, with entry limited to adults either through technology or human control." Such a requirement, they contend, would unreasonably and substantially restrict adult access to materials protected by the First Amendment. The State, on the other hand, contends that

---

[5] This question necessarily involves some fact-based issues, and we have no evidentiary record before us. Ordinarily, this court will refuse to issue an advisory opinion based on facts not in evidence and events that have not yet occurred. *See Tsann Kuen Enterprises Company v. Campbell*, 355 Ark. 110, 127 S.W.3d 486 (2003); *Harris v. City of Little Rock*, 344 Ark. 95, 40 S.W.3d 214 (2001). However, given the unique procedural posture of this case, certified as it is from the federal court, we will nevertheless answer the question.

simply displaying the materials behind the sales counter, placing them in an area defined by ropes, or placing the materials in an "adults only" section to which minors have no access, would suffice.

We conclude that the "safe harbor" provision requires only that some physical obstacle stand between minors and the area where prohibited material is displayed, so that minors have no access to such material. Although this permits the booksellers to choose the method best suited to their individual establishments, it remains for the federal court to ultimately determine whether such a requirement violates the First Amendment rights of booksellers, librarians, and their adult customers.

DICKEY, C.J., BROWN and IMBER, JJ., concurring in part and dissenting in part.

ANNABELLE CLINTON IMBER, Justice, concurring and dissenting. With regard to the first question certified by the federal district court, I concur with the majority that the "narrowing" interpretation proposed by the State would completely nullify the statutory protections afforded by Ark Code Ann. § 5-68-501, *et seq.* (Supp. 2003). I write separately merely to clarify the wide-reaching effect such a construction would have on the protection of minors under the statute. The statute currently prohibits both the "display" of material harmful to minors as well as the "sale" of such material to minors. Ark. Code Ann. § 5-68-502(1)(A),(2)(A) (Supp. 2003). These provisions place notably different burdens on the booksellers and the First Amendment rights of adults to access these materials. Displays are permanently set for all customers who enter the store, regardless of age. Any display that restricts a minor's access to material necessarily restricts to some degree an adult or more mature minor's access to that material. Conversely, the sale of material happens on an individual level. Consequently, booksellers can tailor each sale to the maturity of the purchaser. Hence, when a 10-year-old attempts to purchase a book, the bookseller can evaluate at the time of purchase whether the book is appropriate for the child wishing to purchase it. If the book is not appropriate, the bookseller can refuse to sell the book to that child. The bookseller is, however, still free to shelve and sell that same book to an adult or a more mature minor, if appropriate. Thus, the potential constitutional defects of the "display" provision are not present in the "sale" provision because of the individualized nature of a sale.

Here, the State's proposed "narrowing" interpretation would be applicable to both the "sale" and "display" provisions, as the definition of material that is "harmful to minors" applies equally to both provisions. If we apply a limiting interpretation to the definition of "harmful to minors" so as to avoid the constitutional defect of the "display" provision, such an interpretation will necessarily be applicable to the "sale" provision. Under the interpretation proposed by the State, the statute would only prohibit the sale of material that is harmful to older, more mature minors and not restrict at all the sale of material that is harmful to younger minors. Thus, the proposed "narrowing" interpretation would enable a 10-year old to both browse *and purchase* material that was harmful to him because such material was not harmful to a mature 17-year old. I cannot believe such a construction could ever have been anticipated or supported by the legislature in enacting this statute, and I agree with the majority that we must reject the State's interpretation.

I depart from the majority, however, in answering the second question certified by the federal district court. In this question, the district court asks if books and magazines that have contents containing materials harmful to minors but which have no such material on their binders or covers are being "displayed" if they are simply shelved in the bookshelves. I would answer this question in the negative and interpret the "display" provision to only apply to material with harmful covers or binders. Such an interpretation is consistent with the plain language of the statute. Although "display" is not defined within the statute, Webster's Dictionary defines "display" as, "to spread out before the view; to exhibit to the sight or mind; to exhibit conspicuously." *Webster's Third New International Dictionary* at 654 (2002). Thus, a book that is not harmful on its cover is not "displaying" the harmful-to-minors material. This interpretation makes sense, as a book that only *contains* sexually explicit content does not, by its mere presence on the shelves, cause harm to minors if the harmful content is not being "exposed to view".[1] A minor suffers no harm from viewing a benign cover of a book. Moreover, without an "inviting" cover, a minor is highly unlikely to randomly pick up and browse the contents of the book. Furthermore, minors will be

---

[1] In the unlikely and highly improbable situation that the book was open to the harmful passage, the material would likely be "displayed."

unable to purchase material with harmful content, as the sale of such material is prohibited. Ark. Code Ann. § 5-68-502(2)(A) (Supp. 2003).

This interpretation is also consistent with the legislative history of the statute's safe-harbor provision. The original safe-harbor clause provided that material was not "displayed" for purposes of the statute if it was "kept behind devices commonly known as 'blinder racks' so that the lower two-thirds (2/3) of the material is not exposed to view." Ark. Code Ann. § 5-68-502(1)(B) (Supp. 1999). The plain language of this provision clearly indicates that the legislature was targeting only material with harmful covers and not targeting material with benign covers. In fact, the State and the booksellers are in agreement on this point. Blinder racks are only effective to shield minors from harmful covers and would be completely ineffective to shield minors from the harmful content within a book. Yet, under the majority's interpretation, books with entirely benign covers must neverthe-less be concealed so that the lower two-thirds of the cover is not exposed to view. Such a requirement does not in any way increase the protection afforded by the statute but only leads to an absurd result. *City of Maumelle v. Jeffrey Sand Co.,* 353 Ark. 686, 120 S.W.3d 55 (2003).

On the other hand, the protection of the blinder racks alone could be easily subverted by a mischievous minor lifting the material off the rack to view a harmful cover. Thus, in 2003, the legislature modified the safe-harbor provision by adding a require-ment that the material also be physically segregated from minors. The safe-harbor provision now reads:

> A person shall be deemed not to have displayed material harmful to minors if the lower two-thirds (2/3) of the material is not exposed to view *and* segregated in a manner that physically prohibits access to the material by minors.

Ark. Code Ann. § 5-68-502(1)(B) (Supp. 2003) (emphasis added). The amendment did not substantively change the requirement that the lower two-thirds of the material not be exposed to view; it merely deleted the specific reference to "blinder racks," thereby enabling store owners to implement the provision in the manner that best suited their store. The most obvious reading of the 2003 amendment is that it was aimed at expanding the protection of the previously targeted material (material with harmful covers), and *not* that it was

intending to target additional material. The legislature merely intended to prohibit minors from subverting the statute by lifting the material off the blinder racks to view the covers. With the twin protections of physical segregation *and* coverage of the bottom two-thirds of the material, a mischievous minor cannot physically access the material to lift it off the blinder rack or view the harmful material from afar by peeking into the "adults only" section. As this interpretation is both the least intrusive on the First Amendment and the most consistent with the history and language of the statute, the "display" provision of Ark. Code Ann. § 5-68-502(1)(A) should be interpreted to require both segregation and cover of the lower two-thirds of material with harmful covers but it would not be applicable to material with benign covers. Thus, in my view, books and magazines that have contents containing materials harmful to minors but which have no such materials on their binders or covers are not being "displayed" under the statute if they are simply shelved in bookcases or on bookshelves.

DICKEY, C.J., and BROWN, J., join.