## COMMONWEALTH OF VIRGINIA

### V.

## AMERICAN BOOKSELLERS ASSOCIATION, INC., ET AL.

Record No. 880090

September 23, 1988

Present: All the Justices

*Richard B. Smith, Assistant Attorney General (Mary Sue Terry, Attorney General; Mark R. Davis, Assistant Attorney General,* on brief), for appellee.

*Michael A. Bamberger (Jacqueline S. Glassman; Maxwell Lillienstein; Steven Bierman; Burton Joseph; Paul M Bator; Mark I. Levy; Victor M. Glasberg; Sonnenschein, Carlin, Nath & Rosenthal; Mayer, Brown & Platt,* on brief), for appellees.

RUSSELL, J., delivered the opinion of the Court.

We here construe the 1985 amendment to Code § 18.2-391, which makes it a misdemeanor knowingly to display material "harmful to juveniles" in a manner whereby juveniles may examine and peruse it. Pursuant to our Rule 5:42, the Supreme

Court of the United States, on January 25, 1988, certified to this Court the following questions of Virginia law:

1. Does the phrase "harmful to juveniles" as used in Virginia Code §§ 18.2-390 and 18.2-391 (1982 and Supp. 1987), properly construed, encompass any of the books introduced as plaintiffs' exhibits below, and what general standard should be used to determine the statute's reach in light of juveniles' differing ages and levels of maturity?

2. What meaning is to be given to the provision of Virginia Code § 18.2-391(a) (Supp. 1987) making it unlawful "to knowingly display for commercial purpose in a manner whereby juveniles may examine or peruse" certain materials? Specifically, is the provision complied with by a plaintiff bookseller who has a policy of not permitting juveniles to examine and peruse materials covered by the statute and who prohibits such conduct when observed, but otherwise takes no action regarding the display of restricted materials? If not, would the statute be complied with if the store's policy were announced or otherwise manifested to the public?

We accepted the certification by order entered February 4, 1988.

## I. HISTORY AND PROCEEDINGS

In 1968, the Supreme Court decided *Ginsberg* v. *New York*, 390 U.S. 629 (1968), upholding a New York statute which prohibited the sale to minors of certain material which fell short of "obscenity" as then defined, but which was nevertheless deemed "harmful to juveniles." Our General Assembly responded in 1970 by enacting Code §§ 18.2-390 and 391, which are similar to the New York laws held constitutional in *Ginsberg*. In 1975, the General Assembly amended the definition of "harmful to juveniles" contained in Code § 18.2-390(6) to comport with the Supreme Court's holding in *Miller* v. *California*, 413 U.S. 15 (1973).

In 1985, the General Assembly enacted the amendment here under consideration which added certain language to Code § 18.2-391. The two relevant statutes, with emphasis given to the language added in 1985, now read as follows:

Code § 18.2-390

Definitions. — As used in this article:

(1) "*Juvenile*" means a person less than eighteen years of age.

(2) "*Nudity*" means a state of undress so as to expose the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered or uncovered male genitals in a discernibly turgid state.

(3) "*Sexual conduct*" means actual or explicitly simulated acts of masturbation, homosexuality, sexual intercourse, or physical contact in an act of apparent sexual stimulation or gratification with a person's clothed or unclothed genitals, pubic area, buttocks or if such be female, breast.

(4) "*Sexual excitement*" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(5) "*Sadomasochistic abuse*" means actual or explicitly simulated flagellation or torture by or upon a person who is nude or clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

(6) "*Harmful to juveniles*" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it (a) predominately appeals to the prurient, shameful or morbid interest of juveniles, (b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and (c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.

(7) "*Knowingly*" means having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both (a) the character and content of any material described herein which is reasonably susceptible of examination by the defendant, and (b) the age of the juvenile, provided however, that an honest mistake shall constitute an excuse from liability hereunder if the

defendant made a reasonable bona fide attempt to ascertain the true age of such juvenile.

Code § 18.2-391

UNLAWFUL ACTS. — (a) It shall be unlawful for any person knowingly to sell, rent or loan to a juvenile, *or to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse*:

(1) Any picture, photography, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in subdivision (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sadomasochistic abuse and which, taken as a whole, is harmful to juveniles.

(b) It shall be unlawful for any person knowingly to sell to a juvenile an admission ticket or pass, or knowingly to admit a juvenile to premises whereon there is exhibited a motion picture, show or other presentation which, in whole or in part, depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles or to exhibit any such motion picture at any such premises which are not designed to prevent viewing from any public way of such motion picture by juveniles not admitted to any such premises.

(c) It shall be unlawful for any juvenile falsely to represent to any person mentioned in subsection (a) or subsection (b) hereof, or to his agent, that such juvenile is eighteen years of age or older, with the intent to procure any material set forth in subsection (a), or with the intent to procure such juvenile's admission to any motion picture, show or other presentation, as set forth in subsection (b).

(d) It shall be unlawful for any person knowingly to make a false representation to any person mentioned in subsection (a) or subsection (b) hereof or to his agent, that he is the parent or guardian of any juvenile, or that any juvenile is

eighteen years of age, with the intent to procure any material set forth in subsection (a), or with the intent to procure such juvenile's admission to any motion picture, show or other presentation, as set forth in subsection (b).

(e) Violation of any provision hereof shall constitute a Class I misdemeanor.

American Booksellers Association, Inc., and others[1] (collectively, the booksellers) brought a "civil rights complaint for declaratory and injunctive relief" in the United States District Court for the Eastern District of Virginia against the Director of Public Safety of the City of Alexandria and the Chief of Police of the County of Arlington, seeking to enjoin enforcement of the 1985 amendment. The district court held the amendment unconstitutional and enjoined its enforcement. The Attorney General of Virginia, who had intervened in the federal proceeding, appealed to the Court of Appeals for the Fourth Circuit, which affirmed the district court's decision.

The attorney general appealed to the Supreme Court of the United States. That Court, by opinion handed down January 25, 1988, *Virginia* v. *American Booksellers Ass'n, Inc.*, ____ U.S. ____, 108 S.Ct. 636 (1988), did not accept the factual findings made by the lower federal courts and certified to us the two questions of Virginia law set forth above.[2]

## II. PLAINTIFFS' EXHIBITS

The first certified question requires us to determine whether any of the 16 books introduced as exhibits by the booksellers in the district court are "harmful to juveniles" within the statutory definition. The books are:

R. Bell, Changing Bodies, Changing Lives (1980)
J. Betancourt, Am I Normal? (1983)
J. Blume, Forever . . . (1975)

---

[1] Association of American Publishers, Council for Periodical Distributors Association, International Periodical Distributors Association, Inc., National Association of College Stores, Inc., Books Unlimited, Inc., Ampersand Books, Amy Bush and Jessica Bush (a minor).

[2] The certification procedure had not been available to the parties in the lower federal courts because our Rule 5:42 did not become effective until April 1, 1987, after the proceedings in those courts had been concluded.

P. Blumstein & P. Schwartz, American Couples (1983)
J. Collins, Hollywood Wives (1983)
A. Comfort & J. Comfort, The Facts of Love (1979)
S. Donaldson, Lord Foul's Bane (1977)
The Family of Woman (J. Mason ed. 1979)
P. Haines, The Diamond Waterfall (1984)
J. Joyce, Ulysses (1961)
J. Lindsey, Tender is the Storm (1985)
The New Our Bodies, Ourselves (J. Pincus and W. Sanford
    ed. 1984)
L. Niven & J. Pournelle, Lucifer's Hammer (1977)
The Penguin Book of Love Poetry (J. Stallworthy ed. 1973)
M. Sheffield, Where Do Babies Come From? (1972)
J. Updike, The Witches of Eastwick (1984).

The booksellers contend that these books, displayed for sale in their stores, fall within the prohibition of the Virginia statute.

Because obscene material is outside the protection of the First Amendment, the states may prohibit its dissemination to adults as well as to children. A publication must be judged for obscenity as a whole, however, and not on the basis of isolated passages. *Roth* v. *United States*, 354 U.S. 476, 489 (1957). Published material may have an explicit sexual content which, while perhaps pornographic, falls short of the definition of obscenity. Even though such material may be entitled to the protection of the First Amendment insofar as adults are concerned, the states may, within a carefully defined framework, restrict the access of minors to such material. The basis of the states' authority to control the dissemination of such "borderline obscenity" to minors is based upon the states' legitimate concern with the protection of minors from material deemed "harmful" to them. *See Ginsberg*, 390 U.S. at 636-40; *Freeman* v. *Commonwealth*, 223 Va. 301, 309, 288 S.E.2d 461, 465 (1982).

The New York statute held constitutional in *Ginsberg* provided a tripartite test for the determination of material "harmful to minors." Under that test, such material must (1) predominantly appeal to the prurient, shameful or morbid interest of minors; (2) be patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and (3) be "utterly without redeeming social importance for minors." The three prongs of the test were stated con-

junctively. The 1970 Virginia statute was substantially the same, although the term "juvenile" was used in place of "minor," and the statute was made applicable to persons under the age of 18, where New York had drawn the line at age 17.

In *Miller*, decided in 1973, the Supreme Court made clear that the states might regulate the distribution of obscene material without the burden of showing that it was "utterly without redeeming social value," a test to which a majority of the Justices had never subscribed. *Miller* established the third prong of the tripartite test as a determination "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24. As noted above, our General Assembly, in 1975, amended Code § 18.2-390(6) to incorporate the *Miller* formulation into the third prong of the tripartite test for material "harmful to juveniles." The nature of that third prong is crucial to our determination.

The first two prongs of the tripartite test, "prurient interest" and "patently offensive," are purely questions of fact for determination by a properly-instructed jury. *Miller*, 413 U.S. at 30. As an appellate court, we may not resolve them. The third prong, "lack of serious merit," however, is a mixed question of law and fact, *see Smith* v. *United States*, 431 U.S. 291, 301 (1977), which we may properly decide. Because a work will not be deemed "harmful to juveniles" unless it meets all three prongs of the test, we consider the third prong alone.

The booksellers apprehend that a Virginia prosecutor might consider some of the 16 works in question as lacking "serious literary, artistic, political or scientific value for juveniles" because they would be unsuitable for young children, although suitable for older adolescents. The attorney general responds that the focus of the inquiry is not upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class. A book will pass statutory muster, she contends, if it has serious value for a legitimate minority of juveniles, and in this context, a legitimate minority may consist of older, normal (not deviant) adolescents.

We agree with the attorney general. As Justice Blackmun observed in a similar context,

[T]he Court's opinion stands for the clear proposition that the First Amendment does not permit a majority to dictate

to discrete segments of the population . . . the value that may be found in various pieces of work. That only a minority may find value in a work does not mean that a jury would not conclude that "a reasonable person would find such value in the material taken as a whole." Reasonable people certainly may differ as to what constitutes literary or artistic merit. . . . [T]he Court's opinion today envisions that even a minority view among reasonable people that a work has value may protect that work from being judged "obscene."

(Citations omitted).
*Pope* v. *Illinois*, 481 U.S. 497, 506, 107 S.Ct. 1918, 1924 (1987) (Blackmun, J., concurring in part and dissenting in part). *See also Pinkus* v. *United States*, 436 U.S. 293, 299 (1978); *Freeman* v. *Commonwealth*, 223 Va. at 312, 288 S.E.2d at 466-67. We conclude that if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole.

The 16 books in question run the gamut, as the Supreme Court aptly put it, from classic literature to pot-boiler novels. Having examined them all, we conclude that although they vary widely in merit, none of them lacks "serious literary, artistic, political or scientific value" for a legitimate minority of older, normal adolescents. It would serve no purpose to review the books in detail. Because none of them meets the third prong of the tripartite test, we hold that none of the books is "harmful to juveniles" within the meaning of Code §§ 18.2-390 and 391. Accordingly, the first certified question is answered in the negative.

### III. KNOWING DISPLAY AND PERUSAL

Since 1970, pursuant to the statutes enacted in the wake of *Ginsberg*, a bookseller has been confronted with a dual burden when an apparently youthful customer approaches the cash register to purchase a book: he must make a "reasonable bona fide attempt to ascertain the true age of such [putative] juvenile" (Code § 18.2-390(7)), and he is charged with general knowledge of the character and content of the books he has offered for sale. *See id.* The booksellers make no attack upon these statutes in their pre-1985 form, and, indeed, expressly conceded their consti-

tutionality in oral argument at the bar of the Supreme Court of the United States. Their attack is limited to the 1985 amendment.

The 1985 amendment adds nothing to the dual burden which the booksellers have borne since 1970. Its legislative purpose is plain: to preclude the perusal, by juveniles standing in a bookstore, of harmful materials they are unable to buy. Without the 1985 amendment, the protection of juveniles from harmful materials was obviously incomplete. The thrust of the amendment, therefore, was directed at the perusal of harmful materials by juvenile readers in bookstores, not at the method chosen by booksellers to display their wares for adults.

██ Perusal goes well beyond casual examination. "Peruse" is defined: "to examine or consider or survey with some attention and typically for the purpose of discovering or noting one or more specific points: look at or look through fairly attentively: go through: STUDY . . . READ . . . to read through or read over with some attention and typically for the purpose of discovering or noting one or more specific points. . . ." Webster's Third New International Dictionary 1688 (1976). The 1985 amendment is aimed at detailed examination of the kinds embraced in the foregoing definition, not the casual examination available to a customer who simply surveys the labels, jackets, or dustcovers of books displayed on a bookseller's shelves. We therefore conclude that the amendment is aimed not at the method chosen by the bookseller to display his wares for sale, but at the opportunity he may afford to juveniles to take off the shelves books which they are unable to buy, and to read them in the store.

██ We are considering a criminal statute, and in accordance with familiar principles, it is to be construed strictly, and against the Commonwealth. It cannot be extended by construction or by implication to favor the prosecution. *Harward* v. *Commonwealth*, 229 Va. 363, 365, 330 S.E.2d 89, 90 (1985); *Johnson* v. *Commonwealth*, 211 Va. 815, 819, 180 S.E.2d 661, 664 (1971).

██ Thus, to secure a conviction of a bookseller for its violation, the Commonwealth would have the burden of proving beyond a reasonable doubt that the defendant bookseller *knowingly* afforded juveniles an opportunity to peruse harmful materials, or took no reasonable steps to prevent such perusal when the juvenile's opportunity was reasonably apparent to the bookseller. The amendment's requirement of scienter is significant. It is coupled with the phrase "manner whereby juveniles may examine *and* pe-

ruse" (emphasis added). Thus, the amendment is not violated solely by a particular manner of displaying books for sale. A violation must consist of proof beyond a reasonable doubt that the bookseller knowingly afforded juveniles an opportunity to peruse harmful materials in his store or, being aware of facts sufficient to put a reasonable person on notice that such opportunity existed, took no reasonable steps to prevent the perusal of such materials by juveniles.

Because it is criminal in nature, the statute is not to be given the broad interpretation the booksellers apprehend. The word "may" in the amendment is not to be converted into "might." A scenario may always be envisioned wherein a juvenile, by stealth, secretes a book and manages to peruse it in a store despite the efforts of the most vigilant clerk. The absence of scienter precludes conviction of any bookseller under those circumstances. Reasonable efforts to prevent perusal of harmful materials by juveniles are all that the statute requires of a bookseller.

The question whether a bookseller's efforts were reasonable, in any given set of circumstances is, of course, an issue of fact to be resolved by a properly-instructed jury, but certain general principles may be discerned. Ordinarily, it would be difficult for the Commonwealth to secure a conviction of a bookseller for violation of the statute without proof that juveniles had actually made use of an opportunity to peruse harmful materials in a bookstore with the defendant's apparent knowledge and acquiescence. But actual perusal is not an absolute requirement. If a bookseller were to display materials harmful to juveniles, provide an area in which they could be perused without observation by the bookseller or his employees, and take no reasonable steps to inhibit such perusal by juveniles, a jury properly instructed under the foregoing principles might convict even in the absence of proof that juveniles had actually taken advantage of the opportunity thus afforded to them.

One of the booksellers' witnesses in the district court provided a clear example of a method a bookseller might easily adopt to avoid such a problem. Under the construction we have adopted, there was evidence in the record that the statute would affect relatively few books — less than a single shelf of a typical bookseller's wares. The witness testified that in that particular store, a shelf containing restricted books was located within sight of the bookseller. If a juvenile attempted to peruse them, an employee could

readily intervene. This imposes a relatively light burden upon the bookseller, in contrast to the state's interest in protecting juveniles from materials harmful to them.

In answering the specific inquiries certified to us, we must assume that there are no additional facts upon which the Commonwealth might rely in order to secure a conviction. We will further assume that the hypothetical bookseller "who has a policy of not permitting juveniles to examine and peruse materials covered by the statute" does not merely cerebrate upon such a policy, but takes reasonable steps to put it into effect. Upon those assumptions, the second certified question is answered in the affirmative.

*The first certified question is answered in the negative.*

*The second certified question is answered in the affirmative.*