SHIPLEY, INC., d/b/a That Bookstore in Blytheville; Arkansas Library Association; American Booksellers Foundation for Free Expression, Inc.; Association of American Publishers, Inc.; Comic Book Legal Defense Fund; Freedom to Read Foundation, Inc.; International Periodical Distributors Association, Inc.; American Civil Liberties Union of Arkansas, Inc., Plaintiffs

v.

Fletcher LONG, Jr., District One Prosecuting Attorney; Brent Davis, District Two Prosecuting Attorney; Henry Boyce, District Three Prosecuting Attorney; Terry Jones, District Four Prosecuting Attorney; David Gibbons, District Five Prosecuting Attorney; Larry Jegley, District Six Prosecuting Attorney; ED Easley, District Seven Prosecuting Attorney; WM. Randal Wright, District Eight–North Prosecuting Attorney; Brent Haltom, District Eight–South Prosecuting Attorney; Henry Morgan, District Nine–East Prosecuting Attorney; Tom Cooper, District Nine–West Prosecuting Attorney; Robert Dittrich, District Eleven–East Prosecuting Attorney; Steve Dairymple, District Eleven–West Prosecuting Attorney; Steve Tabor, District Twelve Prosecuting Attorney; Jamie Pratt, District Thirteen Prosecuting Attorney; Ron Kincade, District Fourteen Prosecuting Attorney; Tom Tatum, II, District Fifteen Prosecuting Attorney; Don Mcspadden, District Sixteen Prosecuting Attorney; Chris Raff, District Seventeen Prosecuting Attorney; Steven D. Oliver, District Eighteen–East Prosecuting Attorney; Tim Williamson, District Eighteen–West Prosecuting Attorney; Tony Rogers, District Nineteen–East Prosecuting Attorney, Bob Balfe, District Nineteen–West Prosecuting Attorney; H.G. Foster, District Twenty Prosecuting Attorney; Marc Mccune, District Twenty–One Prosecuting Attorney; Robert Herzfelf, District Twenty–Two Prosecuting Attorney; and Lona Horn Mccastlain, District Twenty–Three Prosecuting Attorney, in their official capacities as Prosecuting Attorneys, Defendants

No. 4:03CV00481GTE.

United States District Court,
E.D. Arkansas,
Western Division.

Nov. 16, 2004.

John L. Burnett, Esq., Lavey & Burnett, Little Rock, AR, Michael A. Bamberger, Esq., Sonnenschein Nath & Rosenthal LLP, New York City, for Plaintiffs.

Timothy Gerard Gauger, Esq., Arkansas Attorney General's Office, Little Rock, AR, for Defendants.

## MEMORANDUM OPINION AND FINAL ORDER

EISELE, District Judge.

In its "Memorandum Opinion and Certification Order" of February 4, 2004, this Court moved the Arkansas Supreme Court, pursuant to its recently enacted Ark. Sup.Ct. R. 6–8 (2004), to answer four (4) questions of law and for cause stated that "this case presents unresolved questions of Arkansas law which are likely to be outcome determinative of this pending federal cause of action." In its thirty-eight page opinion and Order this Court identified the Arkansas statute being challenged by the Plaintiffs, the legislative background of those sections of the Arkansas law claimed to be unconstitutional under the United States Constitution, and a discussion of the applicable law and particularly the cases of *Upper Midwest Booksellers Ass'n v. Minneapolis*, 780 F.2d 1389 (8th Cir.1986), *M.S. News Co. v. Casado*, 721 F.2d 1281 (10th Cir.1983) and *Virginia v. American Booksellers*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (referred to as *"The Virginia case."*) The following four questions were thus certified:

### QUESTION 1.

Is the statute intended to protect *all* minors, i.e. all persons 17–years–of–age and younger, from exposure to "materials harmful to minors"? If the answer is "yes," may the statute nevertheless be interpreted under Arkansas law to protect only those who are the older, more mature minors from exposure to such materials, if that interpretation is the only way to protect the statute from a successful attack under the United States Constitution?

### QUESTION 2.

The statute makes it unlawful to "display material which is harmful to minors in such a way that minors, as part of the invited general public, will be exposed to view such material." Are books and magazines that have contents containing materials harmful to minors but which have no such materials on their binders or covers being "displayed" under the statute if they are simply shelved in bookcases or on book shelves without any additional action or effort to single them out or to draw the attention of the "invited general public" thereto?

### QUESTION 3.

Does a bookseller or librarian "allow to view . . . to a minor . . . any material which is harmful to minors," § 5–68–502(A), by simply shelving and displaying such material, or must he or she affirmatively give permission (i.e. "allow") the minor to view such material before he or she breaches the "allow to view" provision ?

### QUESTION 4.

The "Safe Harbor" provision contained in § 5–68–501(1)(B) requires that the material be "segregated in a manner that physically prohibits access to the material by minors."

**What must booksellers and librarians do to avail themselves of this provision?**

On February 19, 2004, the Arkansas Supreme Court in a per curium decision accepted certification of all four of said questions and set forth its procedural requirements both for briefing and oral argument on the issues presented. *Shipley, Inc. v. Long,* 356 Ark. 220, 148 S.W.3d 746 (2004). On October 21, 2004, the Arkansas Supreme Court delivered its opinion. *Shipley, Inc. v. Long,* 359 Ark. 208, 195 S.W.3d 911 (2004). The Majority Opinion was written by Associate Justice Tom Glaze. A separate opinion, concurring in part and dissenting in part, was written by Justice Annabelle Clinton Imber, in which Chief Judge Dickey and Justice Brown joined.

The Arkansas Supreme Court answered the four questions certified to it as follows:

### QUESTION 1.

Is the statute intended to protect *all* minors, i.e. all persons 17–years–of–age and younger, from exposure to "materials harmful to minors"? If the answer is "yes," may the statute nevertheless be interpreted under Arkansas law to protect only those who are the older, more mature minors from exposure to such materials, if that interpretation is the only way to protect the statute from a successful attack under the United States Constitution?

*Answer:* To the first part, yes. To the second part, no.

### QUESTION 2.

The statute makes it unlawful to "display material which is harmful to minors in such a way that minors, as part of the invited general public, will be exposed to view such material." Are books and magazines that have contents containing materials harmful to minors but which have no such materials on their binders or covers being "displayed" under the statute if they

are simply shelved in bookcases or on book shelves without any additional action or effort to single them out or to draw the attention of the "invited general public" thereto?

*Answer:* Yes.

### QUESTION 3.

Does a bookseller or librarian "allow to view ... to a minor ... any material which is harmful to minors," § 5–68–502(A), by simply shelving and displaying such material, or must he or she affirmatively give permission (i.e."allow") the minor to view such material before he or she breaches the "allow to view" provision ?

*Answer:* The Arkansas Supreme Court held:

> Thus, to violate the 'to allow-to-view' provisions a bookseller must be aware that certain circumstances exist—i.e., that a minor is viewing 'harmful' material. Simply shelving and displaying 'harmful' materials is likely not enough for a bookseller to·violate the 'allow-to-view' provisions, but neither is a bookseller required to grant affirmative permission for a minor to look at 'harmful' materials before he or she will be in violation of the statute. The language of the statute indicates that a bookseller must be aware that a minor is viewing 'harmful' material, and then deliberately turn a blind eye to that activity, before the bookseller will have allowed a minor to view 'harmful' material.

*Shipley,* 359 Ark. 208, 222, 195 S.W.3d 911, 919.

### QUESTION 4.

The "Safe Harbor" provision contained in § 5–68–501(1)(B) requires that the material be "segregated in a manner that physically prohibits access to the material by minors." What must booksellers and

librarians do to avail themselves of this provision?

*Answer:* The Arkansas Supreme Court held:

> We conclude that the 'safe harbor' provision requires only that some physical obstacle stand between minors and the area where prohibited material is displayed, so that minors have no access to such material. Although this permits the booksellers to choose the method best suited to their individual establishments, it remains for the federal court to ultimately determine whether such a requirement violates the First Amendment rights of booksellers, librarians, and their adult customers.

*Shipley,* 356 Ark. at 223, 148 S.W.3d at 747.

### DISCUSSION

So that it will not have to repeat here all that was stated in its February 4, 2004, Memorandum Opinion and Certification Order, the Court hereby adopts that opinion and order by reference.

The entire Arkansas Supreme Court is in agreement in concluding that the statute is intended to protect *all* minors, i.e., persons 17 years of age and younger, from exposure to "materials harmful to minors." The Court is also unanimous in its conclusion that the statute may not be interpreted to protect only those who are the older, more mature minors from exposure to such material, even if that interpretation were the only way to protect the statute from a successful attack under the United States Constitution. The concurring opinion reinforces the majority's reasoning on the second part of Question 1. It is important to set forth the critical language in the Arkansas Supreme Court's separate opinions on the issues presented by Question 1.

The majority states:

The first of the federal court's four questions poses the heart of the matter: can § 5–68–502, as amended, be given a narrow enough construction that will both save the statute from constitutional infirmity and, at the same time, leave it with any meaning?

\* \* \* \* \* \*

The federal district court first asks this court whether the statute is intended to protect *all* minors, or all persons seventeen years of age and younger, from exposure to material deemed "harmful to minors." The answer to this question is plainly yes. Ark.Code Ann. § 5–68–501(7) (Supp.2003) defines a minor as *"any person* under the age of eighteen (18) years" (emphasis address). There is no limitation or qualification on this definition; thus, we construe the phrase "any person" to mean "every person" under the age of eighteen. Both the booksellers and the State agree on this issue. Because the statute defines a minor as "any person under age of eighteen," the statute is obviously intended to protect *all* minors from exposure to material deemed "harmful to minors." The second part of the district court's question asks whether, if the answer to the first part is "yes," may the statute be interpreted under Arkansas law "to protect only those who are the older, more mature minors from exposure to such materials, if that interpretation is the only way to protect the statute from a successful attack under the United States Constitution." This is the approach taken by the supreme court of Virginia in *Commonwealth v. American Booksellers Ass'n, Inc.,* 236 Va. 168 372 S.E.2d 618 (1988).

*Shipley,* 359 Ark. at 216, 195 S.W.3d at 915.

The majority opinion goes on to analyze the Virginia Supreme Court's decision to

adopt a very narrow interpretation of "minors" in order to preserve its constitutionality:

The Virginia high court concluded that the focus of the inquiry should not be upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class. The court concluded, "if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole." *Id.*, 236 Va. at 177, 372 S.E.2d at 623–24.

In the present case, the State urges us to adopt the same "narrowing" interpretation utilized by the Virginia court, reminding this court that it is our duty, if it is at all possible, to adopt an interpretation of an act that preserves its constitutionality. However, under the Virginia court's so-called "variable obscenity" interpretation, works which are plainly inappropriate for younger children would not fall within the scope of the statute, because those works would have some serious literary, artistic, political, or scientific value for an older adolescent. For example, during oral argument, counsel for the booksellers pointed out that a book such as *The Joy of Sex* could be considered to have serious value for a married seventeen–year–old, who might refer to the book for guidance. That book, counsel surmised, has serious value for the older minor, and therefore it would not be considered "harmful," within the meaning of the statute and would thus be available for all minors to examine. However, *The Joy of Sex* is obviously not suitable for a five-year-old child, who would nonetheless have access to this book under the State's proffered interpretation.

As noted above, by its specific language in § 5-68-501(7), the General Assembly clearly intended to protect *all* minors from harmful materials. However, it is also obvious that the State's construction does *not* protect *all* minors, because it permits younger minors to have access to material that may actually be "harmful" to them, within the meaning of the Arkansas statute. Under such an interpretation, the "exception[s] would swallow the rule, and the rule would be meaningless." *Griffen v. Arkansas Judicial Discipline & Disability Comm'n,* 355 Ark. 38, 130 S.W.3d 524 (2003).

The State asserts that the five-year-old would still be protected from material that is considered "harmful" to a seventeen-year-old, and that the statute can be saved by interpreting it in that manner. However, the General Assembly's declared intent was to protect "minors," defined as "any person under the age of eighteen years." If the younger minors are to be protected from "harmful" materials, surely the General Assembly did not intend for those younger children to be permitted to access materials that would arguably be "harmful" to them, even though not "harmful" to an older child. We cannot construe Arkansas' statutory law in such a way as to render it meaningless, and we will not interpret a statute to yield absurd results that are contrary to legislative intent. *City of Maumelle v. Jeffrey Sand Co.,* 353 Ark. 686, 120 S.W.3d 55 (2003). Therefore, we must reject the "narrowing interpretation" proposed by the State, and as such, we answer the second part of the federal district court's first question in the negative.

*Shipley,* 359 Ark. at 219, 195 S.W.3d at 917.

The concurring opinion reinforces the majority's opinion as follows:

I write separately merely to clarify the wide-reaching effect such as construc-

tion would have on the protection of minors under the statute. The statute currently prohibits both the "display" of material harmful to minors as well as the "sale" of such material to minors. Ark.Code Ann. § 5–68–502(1)(A), (2)(A) (Supp.2003). These provisions place notably different burdens on the booksellers and the First Amendment rights of adults to access these materials. Displays are permanently set for all customers who enter the store, regardless of age. Any display that restricts a minor's access to material necessarily restricts to some degree an adult or more mature minor's access to that material. Conversely, the sale of material happens on an individual level. Consequently, booksellers can tailor each sale to the maturity of the purchaser. Hence, when a 10–year–old attempts to purchase a book, the bookseller can evaluate at the time of purchase whether the book is appropriate for the child wishing to purchase it. If the book is not appropriate, the bookseller can refuse to sell the book to that child. The bookseller is, however, still free to shelve and sell that same book to an adult or a more mature minor, if appropriate. Thus, the potential constitutional defects of the "display" provision are not present in the "sale" provision because of the individualized nature of a sale.

Here, the State's proposed "narrowing" interpretation would be applicable to both the "sale" and "display" provisions, as the definition of material that is "harmful to minors" applies equally to both provisions. If we apply a limiting interpretation to the definition of "harmful to minors" so as to avoid the constitutional defect of the "display" provision, such an interpretation will necessarily be applicable to the "sale" provision. Under the interpretation proposed by the State, the statute would only prohib-

it the sale of material that is harmful to older, more mature minors and not restrict at all the sale of material that is harmful to younger minors. Thus, the proposed "narrowing" interpretation would enable a 10–year old to both browse *and purchase* material that was harmful to him because such material was not harmful to a mature 17–year old. I cannot believe such a construction could ever have been anticipated or supported by the legislature in enacting this statute, and I agree with the majority that we must reject the State's interpretation.

*Id.* at 359 Ark. at 224, 195 S.W.3d at 921 (J. Imber, concurring).

It is also important to set forth the majority's explanation of its answer to Question 2 which keys in on the meaning of the word "display" in the statute:

The second question the federal court certified to us requires us to interpret the word "display," as set out in § 5–68–502, which, as noted above, provides in relevant part that it shall be unlawful to "display material which is harmful to minors in such a way that minors, as a part of the invited general public, will be exposed to view such material." The federal court asks whether books and magazines with "harmful" contents, but with no "harmful" material on their covers, are "displayed" under the statute if they are simply shelved in bookcases or on bookshelves without any additional action or effort on the part of the bookseller to single them out or draw attention to them. In *Ginsberg v. State of New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), the Supreme Court held that a state may prohibit the distribution of sexually explicit materials to children, even though the materials would not e considered obscene if they were distributed to an adult. *Ginsberg*,

390 U.S. at 636–37, 88 S.Ct. 1274. Such prohibitions are permissible, so long as they do not unreasonably restrict adults' access to material which is not obscene as to them. *See Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389 (8th Cir.1985).

The Arkansas statute employing the word "display" does not define the term. However, other sources define the word to mean "to present or hold up to view." *See The American Heritage Collage Dictionary* at 400 (3d ed.1997). The booksellers argue that the "display" provisions of the Arkansas statute encompass books without "harmful" materials on their covers, suggesting that the deletion of the blinder rack provision, and the addition of the "physical segregation" requirement, means that the display restriction also includes within its scope works without harmful materials depicted on their covers. Specifically, the booksellers claim, the phrase "segregated in a manner that physically prohibits access to the material" indicates that more than visual obstruction is intended; otherwise, simply using blinder racks—the option previously provided, but now deleted by the General Assembly—would be sufficient.

The State, on the other hand, asserts that books and magazines without harmful materials on their covers should not be considered "on display" if they are simply shelved in bookcases or on book shelves. The State suggests that the physical segregation requirement is intended to prevent minors from browsing through books or magazines that, by virtue of "harmful" materials on their covers, might tempt minors to browse through or view matters inside the book or magazine.

However, the State's argument overlooks the fact that the statute's definition of "material" does not limit that term to the covers of books and maga-

zines. "Material" is defined as "any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture, film, record, recording tape, CD–ROM disk, magnetic disk memory, magnetic tape memory, video tape, or other media, but does not include matters displayed, transmitted, retrieved, or stored on the internet or other network for the electronic dissemination of information[.]" § 5–68–501(6). The question posed to this court was whether "materials" that are "harmful to minors" are displayed when they are set out on the bookstore shelf. A literal reading of the statute would have to mean that materials harmful in terms of their content, even if they have no "harmful" material on their covers, *are* "displayed in such a way that minors . . . will be exposed to view such materials," if they are simply shelved, because the terms of the statute make it plain that "material" is *not limited to the covers* of books and magazines.

The concurring opinions assert that a book without a harmful cover is not "displayed" to minors if it is merely present on a bookshelf. However, this ignores the fact that the statutory definition of "material" makes no distinction between contents and covers. Clearly, the General Assembly's intent was to include all material harmful to minors, whether that "harmful" material is on a book's cover or is contained with its pages.

In sum, if "material harmful to minors" is shelved on a bookshelf, even without some other effort made to draw attention to it, it is "displayed" within the meaning of the statute. Even if a book only has "harmful" content, but not a "harmful" cover, the bookseller could still be subject to prosecution if that book were not obstructed from view *and*

physically segregated. Thus, we answer the second question in the affirmative. *Id.* at 359 Ark. at 220–21, 195 S.W.3d at 918.

If the Arkansas Supreme Court had followed the Virginia Supreme Court by confining the definition of "minors" to "a legitimate minority of normal, older minors," this Court, following applicable precedents, would have been confronted with a much more difficult issue of First Amendment law. But, the Arkansas Supreme Court instead concluded that the Virginia interpretation would render the Arkansas statutory law "meaningless" and that "we will not interpret a statute to yield absurd results that are contrary to legislative intent." *Id.* at 218, 195 S.W.3d at 917.

The federal district court in the *American Booksellers* case raised the issue of older minors' First Amendment rights:

We also question whether an older minor's first amendment rights can be limited by the standards applicable to younger juveniles. "[M]inors are entitled to a significant measure of First Amendment protection" and the government may restrict these rights "only in relatively narrow and well-defined circumstances." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 212–13, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (1975). These restrictions are justified when a child is not possessed of a full capacity for individual choice, and, in assessing that capacity, the age of the minor is a significant factor. *Id.* at 214 n. 11, 95 S.Ct. at 2275 n. 11. While the preamendment statute allowed retailers to consider a minor's relative maturity in deciding whether to sell a particular item to him, the current statute's display provision is not susceptible to such a selective application.

*American Booksellers,* 617 F.Supp. at 707, n. 7. And the Fourth Circuit noted its disagreement with the Tenth Circuit case

of *M.S. News* and the Eighth Circuit case of *Upper Midwest Booksellers* as follows:

As we note, *infra,* we disagree with the rationale of some cases which hold that otherwise constitutionally offensive "display" provisions can be legitimized by specifying certain restrictive display methods as being acceptable under the statute. Technically, however, the ordinance upheld in *M.S. News Co. v. Casado,* 721 F.2d 1281 (10th Cir.1983), is distinguishable from the Virginia statute which we review in that it specifically provides that material kept behind "blinder racks" was not deemed to have been "displayed." Similarly, retailers were able to comply with the ordinance in *Upper Midwest Booksellers,* 780 F.2d 1389, by placing the materials behind opaque covers, in sealed wrappers, or in "adults only" settings.

*American Booksellers Assoc., Inc. v. Strobel,* 792 F.2d 1261, 1266 n. 8 (4th Cir. 1986)..

When the Virginia case got to the United States Supreme Court, the appellants' jurisdictional statement contended that the Fourth Circuit's opinion striking down the Virginia statute was in conflict with the noted Eighth Circuit and Tenth Circuit decisions:

Such display provisions as the Amendment do " 'not prohibit adults from purchasing non-obscene materials; adults continue to have ultimate access to the materials in question.' " *Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389, 1395 (8th Cir.1985). "[T]he proscription on display of material harmful to minors does not unreasonably restrict adults' access to material which is not obscene as to them. * * *[A]dults may still have some access to materials not obscene as to them, and they may purchase such material." *M.S. News Co. v. Casado,* 721 F.2d 1281,

1288–89 (10th Cir.1983); *see also Ginsberg,* 390 U.S. at 634–35, 88 S.Ct. 1274 (retailers not prohibited from stocking and selling magazines covered under the statute); *Pacifica Foundation,* 438 U.S. at 750 n. 28, 98 S.Ct. 3026 (adults still may purchase material despite restrictions.)

(Memorandum Opinion and Certification Order, dated Feb. 8, 2004, Exhibit D, p. 1–2).[1]

The appellees responded:

> The Amendment bars any general retail bookstore or newsstand from displaying any book or magazine that could be "harmful" to a hypothetical minor of any age who *could* examine the work. The Amendment thereby restricts access of both adults and older juveniles to material which is not obscene as to them, but which may be "harmful" to the youngest juvenile. The vast overbreadth of the Amendment is most starkly evinced by the Virginia Attorney General's concession before the Fourth Circuit that, under the Amendment, any general retail bookseller who displays *Hollywood Wives* by Jackie Collins, a national bestseller for over six months, on his business premises has committed a misdemeanor. The display of this and other best-selling novels is a crime under the Amendment because a hypothetical nine-year-old for whom the work is "harmful" *may* examine and peruse it.

(Memorandum Opinion and Certification Order, dated Feb. 8, 2004, Exhibit D, p. 3).

The appellees also pointed out that restrictions on the "display" of materials harmful to juveniles has a much greater impact than restrictions upon sales of such materials:

> Restrictions on display have a vastly broader impact on First Amendment rights than do restrictions on sales. Prohibiting the sale of a work to a particular minor as to whom the work is obscene does not affect the First Amendment rights to anyone as to whom the work is not obscene. Prohibitions on display, on the other hand, restrict the access of all readers to any material which is obscene as to the youngest reader. The district court found, based on uncontroverted testimony, that this restriction on access "severely limits sales to adults, since the evidence establishes that adults generally become acquainted with these materials, and desire to purchase them, only if they are readily visible." 617 F.Supp. at 706. The rationale of *Ginsberg v. New York* that supported a variable test of obscenity for *sales* to minors, cannot justify restrictions on *display* to minors, since such restrictions also constitute restrictions on display to adults and older juveniles of books that, as to them, are First Amendment protected. The district court specifically found that display of books is a critical factor in their sale.

(Memorandum Opinion and Certification Order, dated Feb. 8, 2004, Exhibit D, p. 4). And the appellees particularly emphasized the failure of the statute to differentiate among the various sub-classes of minors as to what materials might be harmful to one sub-group and not as to another:

> Any work that is harmful to a juvenile of *any* age cannot be displayed in a general retail book store. The Amendment prohibits a bookseller from making the rea-

---

**1.** The Court attached to its February 4, 2004, Opinion and Order, Exhibit D which consists of excerpts from the jurisdictional statements and pertinent portions of the briefs of the parties in *Virginia v. American Booksellers,* 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).

sonable distinction as to whether a particular work may be "harmful" to a nine-year-old but not "harmful" to a seventeen-year-old.. The Amendment thus irrebuttably presumes that whatever is "harmful" for a nine-year-old may be justifiably proscribed as to a seventeen-year-old college student.

\*     \*     \*     \*     \*     \* .

The amendment prohibits all "display" of materials where juveniles "may" examine and peruse them, and thereby effectively bars the "display" of all such materials to any adult as well. Permitting Virginia booksellers to display only materials suitable for a nine-year-old may insure that no juvenile will peruse "harmful" materials. The First Amendment, however, has never been interpreted to permit such a Draconian prohibition.

\*     \*     \*  ·  \*     \*     \*

The Amendment broadly restricts the First Amendment rights of adults and older juveniles.˙ The Appellant cites no authority, and the lower courts found no authority, to support the vast sweep of the Amendment's prohibition.

(Memorandum Opinion and Certification Order, dated Feb. 8, 2004, Exhibit D, p. 5–6).

Certain portions of the United States Supreme Court's opinion should be repeated at this point:

We have concluded that we should not attempt·to decide the constitutional issues presented without first having the Virginia Supreme Court's interpretation of key provisions of the statute. Several factors combine in a unique way to counsel that course.

\*     \*     \*     \*     \*     \*

Under these unusual circumstances, where it appears the State will decline to defend a statute if it is read one way and where the nature and substance of plaintiffs' constitutional challenge is drastically altered if the statute is read another way, it is essential that we have the benefit of the law's authoritative construction from the Virginia Supreme Court.

\*     \*     \*     \*     \*     \*

Consequently, we shall resort to its certification Rule 5:42 to ask the Virginia Supreme Court whether any of the books introduced by plaintiffs as exhibits below fall within the scope of the amended statute, and how such decisions should take into account juveniles' differing ages and levels of maturity.

\*     \*     \*     \*     \*     \*

It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The key to application of this principle is that the statute must be "readily susceptible" to the limitation; we will not rewrite a state law to conform it to constitutional requirements.

*Virginia v. American Booksellers,* 484 U.S. at 393–97, 108 S.Ct. 636.

The first question actually certified to the Virginia Supreme Court was:

1.   Does the phrase "harmful to juveniles" as used in Virginia Code §§ 18.2–390 and 18.2–391 (1982 and Supp.1987), properly construed, encompass any of the books introduced as plaintiffs' exhibits below, and what general standard should be used to determine the statute's reach in light of juveniles' differing ages and levels of maturity?

The Virginia Supreme Court responded:

The booksellers apprehend that a Virginia prosecutor might consider some of the 16 works in question as lacking "serious literary, artistic, political or scientific value for juveniles" because they would be unsuitable for young children, although suitable for older adolescents. The attorney general responds that the focus of the inquiry is not upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class. A book will pass statutory muster, she contends, if it has serious value for a legitimate minority of juveniles, and in this context, a legitimate minority may consist of older, normal (not deviant) adolescents.

We agree with the attorney general.

\*    \*    \*    \*    \*    \*

We conclude that if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole.

*Virginia v. American Booksellers,* 372 S.E.2d. at 623–24.

By so limiting the interpretation of the Virginia statute, the Virginia Supreme Court ended up with a statute "rewritten" to protect only the older mature cohort of the overall "minor" population. When this interpretation was sent back to the Fourth Circuit Court of Appeals it reversed its earlier decision and upheld the constitutionality of the statute *as so restricted.*

This Court in its February 4, 2004, opinion summed up the consequence of the "Virginia" solution as follows:

The courts have been concerned with the confusion and difficulty which a "variable obscenity" statute would entail if bookstores and libraries had to make the differential obscenity determinations for each of the "minor" age subgroups

within the overall *17 years of age and younger* population. Some of those courts, such as the Virginia Supreme Court, have solved this problem by adopting a narrowing unitary definition of "minors," the effect of which is to prohibit only those materials which are harmful to the older mature minors. This narrowing interpretation tends to solve the problem confronting bookstores and libraries with the difficult problems of making differentiated obscenity interpretations for the various age groups within the overall "minor" classification. And this narrowing interpretation protects the rights of minors to access and view materials not obscene as to them. But, again, does not such a narrowing interpretation distort the obvious objectives of the statute beyond recognition? If only materials that are harmful to the older mature "minors" are proscribed, does this not mean that all those materials which are harmful only to younger minors, say 15 years of age or under, are *not* proscribed and therefore may be displayed? If so, the statute only protects a very small segment of the overall "minor" population, and, ironically, that is the older, more mature segment. Is it possible to believe that the legislature would have enacted this law if it knew that the courts, to save it from certain constitutional attacks, would so limit its application?

(Memorandum Opinion and Certification Order, dated Feb. 8, 2004, at pp. 33–34).

It is now clear that under the Arkansas statute, as authoritatively interpreted by the Arkansas Supreme Court, material which is only harmful to the youngest of the minors may not be displayed by Plaintiffs even though such material would not be harmful to adults or older minors. The statute therefore effectively stifles the access of adults and older minors to commu-

nications and material they are entitled to receive and view.

The Defendants at the hearing on December 8, 2003, continued to argue that *Upper Midwest* is still good law and should, as the latest Eighth Circuit precedent, control. Note counsel's language:

As to the argument that *Upper Midwest* is no longer good law, there is no case out there, from the U.S. Supreme Court level to the Eighth Circuit, that has definitively called into question or overruled *Upper Midwest*. And the reason is that the Court did not get into addressing what the relevant floor or ceiling was for these display provisions in the Virginia case. They remanded it to the Fourth Circuit who ultimately made a determination. The Supreme Court never made the determination on the Virginia statute at issue. So, therefore, the *Upper Midwest* case is still binding law for this circuit. And as the Court appropriately pointed out, that was a more restrictive display ordinance than the one we have here in question, and that it required materials to be in opaque wrappers so that adults would have to buy the material in order to view it, whereas here they must simply walk over to a certain area and they can still access the stuff in the store and peruse it as they see fit. So there is no law that has called into question or overruled *Upper Midwest*.

(Transcript pp. 53–54).

Plaintiffs' counsel at the same oral argument anticipated this contention and answered it as follows:

Mr. Bamberger: The provision—basically, there's a fairly consistent theme throughout the definition of "harmful to minors" in the various states, keyed back to what New York had in the *Ginsberg* case. There are some state cases, and very few, which one can read in terms of imposing variability of age and maturity of the minor. And, in fact, the issue had never really come up because initially the *Ginsberg* case involved sale. Most of the other cases involved sale. And my guess is—and this is a guess, just having practiced in this area for a number of years from a First Amendment perspective—that people assumed that one can have material which is appropriate and has value for a 17–year-old male that would not be appropriate and would not have value for a 12–year-old girl. And the problem came when statutes started coming which applied "harmful to minors" to the display context where you're not dealing one-on-one, but you're dealing with people as a mass. And that's what came up to the Supreme Court in *American Booksellers/Virginia*, which, by the way, is a case in which I was involved. My recollection is that the—and I've got the briefs in my office and can check it when I get back—is that the papers filed by the Commonwealth of Virginia requesting that the court take jurisdiction were based on a conflict between the Virginia case, which was called *Virginia v. American Booksellers v.* , the Fourth Circuit case, and the *Casado* case and the *Upper Midwest* case. The Fourth Circuit in the initial *American Booksellers/ Virginia* decision took a much narrower view of what was permissible in the display context. And, in fact, if my recollection of the oral argument before the Supreme Court and the argument before the Virginia Supreme Court, which I made, is that the assumption was that *Casado* and *Upper Midwest* no longer ruled, because otherwise you wouldn't have to get into the issues that the two questions that the U.S. Supreme Court directed to the Virginia Supreme Court. Those questions would not be required to be answered to validate the Virginia statute if one applied the *MS News v. Casado/Upper Midwest* theories.

(Transcript pp. 27–29). Plaintiffs' counsel's recollection was correct. The Court agrees with Plaintiffs' view on the issue. One cannot carefully review the *Upper Midwest* and *MS News* cases in the aftermath of the full development of the "Virginia Case" without concluding that those prior Eighth and Tenth Circuit cases would not control the disposition of this case.

Questions 3 and 4, and the Arkansas Supreme Court's answers thereto, deal with the "allow to view" issue and the proper interpretation of the "Safe Harbor" language, *to-wit:* "segregated in a manner that physically prohibits access ...." Because the "allow to view" language is tied to the "display" issue and because of the Arkansas Supreme Court's interpretation of the "allow to view" language,[2] this Court concludes that said language is not facially unconstitutional since it can be constitutionally interpreted in some factual contexts. And, although a closer question, the Court concludes that it may not hold the physical segregation provision facially unconstitutional on the basis of the summary judgment record in this case.

### Conclusion

The Court concludes the challenged "display" provisions of Ark.Code Ann. Section 5–68–502, as amended by Act 858 of March 28, 2003, are facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution because such provisions are overbroad and impose unconstitutional prior restraints on the availability and display of constitutionally protected, non-obscene materials to both adults and older minors.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (Docket No. 8) must therefore be, and it is

hereby, GRANTED, to the extent stated herein.

Plaintiffs are entitled to a Declaratory Judgment making it clear that said "display" provisions are facially unconstitutional, void, and of no effect.

Although Plaintiffs would ordinarily be entitled to a permanent injunction enjoining the Defendants, and each of them, and their agents, attorneys and employees from enforcing said display provisions in any manner whatsoever, the Court concludes that such an injunction is not necessary here because there is no threat that the Defendants will ignore or fail to comply with the Court's Declaratory Judgment.

IT IS FURTHER ORDERED that Defendants' Cross–Motion for Summary Judgment (Docket No. 16) be, and it is hereby, DENIED.

Judgment will be entered separately herewith.

---

**2.** *See, infra,* the Arkansas Supreme Court's    Answer to Question 3.